THE SAVANNAH, ALBANY AND GULF RAILROAD COMPANY, *et al.*, plaintiffs in error, *vs.* PATRICK K. SHIELS, *et al.*, defendants in error.

1. The Act of the Legislature, assented to on the 4th December, 1861, amendatory of the charter of the Savannah, Albany and Gulf Railroad Company, authorizing them " to extend their road from any point at or in the city of Savannah to the island of Tybee," does not authorize them to extend their road into the city, in a direction differing from that to Tybee Island, and to lay their track through the entire length of one of the streets, with a grade requiring deep excavations and high embankments.

2. The proper construction of that Act authorizes the Company to extend its road from some point on the road already built, " at or in the city of Savannah," with reasonable directness to the island of Tybee.

3. Under the provisions of the charter of the city of Savannah, the Mayor and Aldermen have no power to grant to a railroad company the privilege of appropriating a portion of any street, from end to end, and by excavations, embankments, precluding all other uses of such portion.

4. Where a proprietor of unimproved land, within the limits of an incorporated city, lays out and dedicates a portion of it as a street, then lays off lots on said street, and, with a view of enhancing their value, sells them with the express stipulation that the street, on which they so abut, "shall be kept open to its full dimensions for all time," if the city government accept the street, they take it encumbered with a trust in favor of the purchasers of said lots, and their successors in title; and equity will enforce that trust, by enjoining the construction of any work materially obstructing the free use of such street, as originally projected and dedicated.  How such dedication shall be made, and how proven?  Query.

5. The placing of a permanent obstruction in any street of an incorporated city, without proper authority to do so, creates a public nuisance, and Courts of Equity have power to enjoin such a work in progress, or about being commenced.

Bill in equity, in Chatham Superior Court.   Tried before Judge FLEMMING, at —— Term, 1863.

The statement of the case will appear in the opinion of the Court.

LAW & LOVELL and THOMAS E. LLOYD, for plaintiffs in error.

H. R. JACKSON, for defendants in error.

*By the Court.*—JENKINS, J., delivering the opinion.

The defendants in error, in their bill filed in the Superior Court of Chatham county, state that they own and occupy severally, improved lots on Randolph street, in the city of Savannah, and they allege as the grievance, in the course of perpetration, against which they pray an injunction, that the defendants, to-wit, "the Savannah, Albany and Gulf Railroad Company, a corporation created by Act of the General Assembly, and Gazaway B. Lamar, of said county, by their agents, servants and laborers, are now changing the face and character of said street, are digging out excavations in some places to the depth of from twenty to twenty-five feet, are throwing up embankments in other places to the height of from twelve to fifteen feet, all in the centre of said street, throughout its entire length, from the Thunderbolt road to the Savannah river, so as entirely to prevent the passing and repassing across said street, so as greatly to impede the passing to and fro along said street, so as to prevent the turning of vehicles in said street, so as greatly to impede and prevent the entrance and exit of vehicles into and from said lots, in short, so as to render said street entirely useless for the usual purposes of a street, for which purposes, and for which purposes alone, said Randolph street was originally designed, and in trust to secure which alone could title to the land which constitutes it, be rightfully vested in the Mayor and Aldermen of said city of Savannah."

Independently of the right which they, in common with all of the inhabitants of Savannah, and lot owners, have to the free and unobstructed use of the streets and thoroughfares of said city, they set forth a special equity in the premises, appertaining to them as owners of said lots, as follows:

"And your orators further show unto your Honor, that Randolph street was not originally one of the streets of said city of Savannah, the title to which has always resided in the Mayor and Aldermen of said city, but that the land now constituting said street was formerly part and parcel of a private tract or tracts of land, which contained, with others, the

The Savannah, Albany and Gulf R. R. Company *vs.* Shiels.

various lots hereinbefore described as now belonging to your orators, and that said land constituting said street, was set apart by Nicholas J. Bayard and others, then proprietors of said tract or tracts, to be for all time to come, a thoroughfare for the special use and convenience of the persons who might thereafter purchase or occupy said lots, and only as incidental to and consequent upon this primary object, for the general use of the public as a street, the said Nicholas J. Bayard and others, receiving no pecuniary compensation therefor from the said, the Mayor and Aldermen of said city, nor from any person whatsoever, but designing thereby to enhance the value, and to promote the sale of said lots; and your orators further show unto your Honor, that in consequence of the setting apart of said street as aforesaid, the value of all the real estate fronting upon it, and of all the real estate contiguous thereto, and fronting upon or bounded by the streets running into said Randolph street, and all of which real estate was originally contained in the same tract or tracts of land, was in truth greatly enhanced, and having been divided into lots, found a ready market;. and your orators further show unto your Honor, that your orators thus became purchasers of the lots hereinbefore described as fronting upon and bounded by said Randolph street, and also of other lots from the same tract or tracts contiguous thereto, with the full faith and understanding that the said street was indeed set apart, and to be kept open for all time, to the full dimensions laid down upon the maps, by which they were induced to purchase."

Upon the exhibition, to Judge Fleming, of the bill, properly verified, he granted a rule *nisi*, requiring the defendants to show cause why an injunction should not be issued against them as prayed. It does not appear, from the transcript, that the defendants had answered the bill at the time of the hearing. They, however, introduced as evidence, the affidavits of five citizens, who testify that they own lots fronting on Randolph street, and desire the extension of the Savannah, Albany and Gulf Railroad through it, as being now made. They also presented the affidavit of the presi-

dent, and one of the directors of the company, who depose that "the railroad projected by said company through Randolph street, and in the process of construction, is contemplated as a commencement of the extension of the road of said company to the island of Tybee, as authorized by the Act of the Legislature of the State of Georgia, assented to on the fourth day of December, 1861; and that it is a practicable and eligible route; and that in pursuance of said route the said company has had liberal offers made to it, of the right of way." They also introduced the following ordinance:

"AN ORDINANCE to amend an Ordinance to grant a certain Right of Way to the Savannah, Albany and Gulf Railroad Company, passed 11th December, 1857.

SECTION 1. Be it ordained by the Mayor and Aldermen of the city of Savannah in Council assembled, That the Savannah, Albany and Gulf Railroad Company be authorized to construct the track of their railroad from their depot twelve feet inside across Liberty street and the Thunderbolt road, into Randolph street, on the same level as the track now is within their depot—and through Randolph street at a grade of thirty feet to the mile at the head of Lamar's Canal, provided the city is held harmless by said railroad company against any suit or damages which may be brought against said city caused by the extension of said road.

SEC. 2. And be it further ordained by the authority aforesaid, That the requisitions of the Ordinance of 1857, relative to securing the sides of the track with masonry, be suspended till two years after the close of the war, that the materials and work may be procured on reasonable terms.

SEC. 3. All ordinances and parts of ordinances militating against this ordinance, be and the same are hereby repealed.

Ordinance passed in Council, 11th February, 1863."

The complainants in rebuttal offered the affidavits of four citizens, who testify that " they think the excavations and embankments, along the line of the railroad being constructed upon Randolph street, will be a very serious injury and detriment to the property in that quarter of the city, and more

especially upon the street itself, depreciating it in value, and greatly detracting from its enjoyment." Also a certificate of P. K. Shiels (one of the complainants) that "Randolph street is but sixty feet wide, as laid down upon the map of the city of Savannah." Also the following affidavits of certain of the complainants :

"GEORGIA—CHATHAM COUNTY.

"Personally appeared before me, Patrick K. Shiels and Henry Seltzer, who, being duly sworn, depose and say, that the railroad projected by the Savannah, Albany and Gulf Railroad Company through the City of Savannah, by way of Randolph street, is not an extension of said Savannah, Albany and Gulf Road towards Tybee Island, as authorized by the Act of 1861, but, on the contrary, that it is a clear perversion of the franchise granted them by that Act, to a wholly different object, in nowise contemplated by it; for that (first) there is a much nearer route to said island from the terminus of said railroad in the city of Savannah, than the one now pretended to be projected for that purpose, the point at the extreme northern end of Randolph street being quite as far, if not further, from Tybee Island than the said depot itself; for that (secondly) when said road shall have reached the head of Lamar's Canal, to be continued in a direct line to Tybee Island, it must cross the entire low lands and marshes on the south side of the Savannah river, the latter being impassable for a railway, save at such enormous expenditure of time, labor and money, as to place its construction beyond the reach of rational contemplation ; for that (thirdly) to reach Tybee Island, said road must cross St. Augustine's creek, a navigable stream, over which it will be necessary to throw such a bridge as will not seriously interfere with the public right, and that the construction of said bridge, in legal form, upon a direct line from the head of Lamar's Canal to Tybee Island, is a simple impossibility from the nature of the lowlands and of the marshes ; for that (fourthly) the only feasible crossing-place from such railroad will be at Causton's Bluff, to reach which from the head of Lamar's Canal will

require that the track shall re-ascend the bluff which it will have descended by Randolph street at great labor and expense, and that thus, while if it could be constructed upon a direct line from Lamar's Canal, its entire course would present, in comparison with a direct line from the present depot, two sides of a triangle, in returning to that direct line at Causton's Bluff it will have already made a segment of a circle; for that (fifthly) not simply is the route from the depot of said railroad to Tybee Island more eligible, with an eye to the distance to be saved, but that upon that line there are causeways formerly used over the intermediate islands between Causton's Bluff and Tybee, and from the depot to Causton's Bluff is level upland, requiring little or no excavation and little or no embankment; for that (sixthly) just prior to obtaining the Act of 1861, said Savannah, Albany and Gulf Railroad had purchased and do now hold a tract of land lying upon the southwest side of Thunderbolt road, and that said land was purchased for the purpose of constructing said road to Tybee by that line, and that while said road to Lamar's Canal was then also under contemplation, it was quite a different idea from the road to Tybee Island; for that (seventhly) said road through Randolph street is designed and is now being constructed not to connect said depot with Tybee Island, but with the wharf property of G. B. Lamar, and that the liberal offers of right of way made to said company, should they carry their projected road to that point, have been made by the said G. B. Lamar, and by him alone, and made because the construction of said road to the head of his canal will greatly enhance the value of his property and enrich him, but that the gain to the road by said donation of said right of way, will in nowise set off the immense expenditure required for the construction of the track to said point and from said point to Tybee Island, whether in direct line or in zigzag line by the way of Causton's Bluff.                          "P. K. SHIELS.

                                          "HENRY SELTZER."

"Sworn to before me this 9th of May, A. D., 1863.

                "WM. H. BULLOCH, Clerk S. C. C. C."

"GEORGIA—CHATHAM COUNTY.

"Personally appeared before me, Patrick K. Shiels, Henry Seltzer, and Patrick Gleason, who, being duly sworn, depose and say that they are acquainted with the ownership of the lots upon Randolph street, and that the complainants, with others, who do not consent to the passage of the railroad through that street, hold upon it a front of twelve hundred and eighty-five feet; that all of the lots making up this length of front, save three, are improved, having upon them dwelling houses; that there are no other improved lots upon the street except the one owned by Mr. G. B. Lamar, one owned by Mr. Hiram Roberts, and some two or three lots belonging to negroes and held in trust for them by Mr. John N. Lewis; that Mr. Seaborn A. Jones' property upon that street lies open and unimproved; that such is the case with all of Mr. Lamar's, save the lot above referred to, and that his (Mr. Lamar's) is mostly swamp and creek land, and never laid off or returned as city lots; and that Mr. Andrew Low owns no lot upon the street, his interest being simply in a flour mill constructed upon piles driven into the swamp at the end of Broughton street; and that Mr. Hiram Roberts bought the lot ...... only recently, and, as deponents verily believe, to remove an obstacle to the construction of the railroad through that street.

"P. K. SHIELS,
"HENRY SELTZER.
"P. GLEASON.

"Sworn to before me this 9th of May, A. D., 1863.
"WM. H. BULLOCH, Clerk S. C. C. C."

After hearing, the Chancellor granted the injunction, on the ground that the work in progress, when completed will entirely obstruct sixteen feet of said street in its centre, and throughout its entire length, leaving between the railroad and the curb-stone on each side a space of but twelve feet, which is insufficient for vehicles to turn in, or to pass each other, and which is an unreasonable abridgment of the easement in a street of the public. It is intimated, however,

with sufficient distinctness, that were there left on each side sufficient space for such turning and passing of vehicles, the abridgment of the public easement, would not have been considered unreasonable, and the consent of the Mayor and Aldermen would have legalized the appropriation.

To so much of the ruling of the Chancellor, as allowed the injunction, the defendants below excepted :

1st. Because his Honor erred in deciding that the Mayor and Aldermen of the city of Savannah, and the Legislature of the State of Georgia combined, have not the power to grant to the said Savannah, Albany and Gulf Railroad, the right of running the track of said road through Randolph street in the city of Savannah, under the circumstances stated in said bill, and the fact that by an ordinance of the city ten feet are allowed for porticos and sidewalks, leaving but twelve feet for the passing of vehicles.

2d. Because his Honor erred in deciding that the construction of the railroad through Randolph street was an unreasonable abridgment of the easement in said street, to which the public are entitled, and such as cannot be authorized by the Act of the Legislature and the Ordinances of Council.

3d. Because his Honor erred in deciding that the limited space in Randolph street for the passage of vehicles was produced by the construction of the railroad through said street.

4th. Because his Honor erred in deciding that the construction of said railroad through said street creates a nuisance.

5th. Because his Honor erred in granting the injunction on the foregoing grounds.

LAW & LOVELL,
THOS. E. LLOYD,
Attorneys for Plaintiffs.

We deem it unnecessary to consider the exceptions *seriatim.* We are not by any means satisfied, from the terms of the Act of the Legislature, approved 4th December, 1861, that that body granted or intended to grant to the company the privilege of constructing their road through any street of the city,

in the manner it is being done, nor, indeed, in any manner, by longitudinal intersection. It is not pretended that there is either in the original charter, or in the Act of 1861, any express grant, authorizing such intersection.    But it is said, that the latter authorizes it "by necessary implication," when it authorizes the extension, "from any point at or in the city, to Tybee Island." The argument is, that the company is · not restricted in this extension to their depot, or to any point on their road, as the terminus *a quo*—but that it may make any point in the city that terminus.    And the right to do that, involves the right to connect that starting point for Tybee, with their depot; otherwise the line of road to Tybee, would not be an extension, but an independent road.    Let us see to what this construction would lead.    The present depot of the company is near the eastern boundary of the city, and Tybee Island is east of the city.    By this construction of the Act, they would be authorized to select a point, in the city, most remote from their depot, as the terminus *a quo* of the Tybee extension ; to traverse, (going west-wardly) the entire breadth of the city, coursing along any number of streets and lanes, through any number of public squares, or through Forsyth Park, so as to connect their depot with that terminus, and thereby preserve the extension character of the new work ; again to traverse any number of streets, lanes and squares, through the entire breadth of the city, to obtain an eastern outlet to Tybee, which was just at hand before leaving their depot.    I cannot think that this construction will commend itself to the favor of any serious, unprejudiced inquirer after legislative intention. What was the subject of this legislation?    The extension, to a definite point, of a railroad already constructed.    Now the fair presumption is, that the Legislature contemplated an extension, on the nearest eligible line—eligible, I mean, with reference to facility of construction, not to the attain-ment, by indirection, of objects not specified in the charter. The evidence does not disclose any fact from which we may infer that there exists, on the direct line from the point of the present terminus, to Tybee, any obstruction to over-

come or avoid, which it is necessary first to enter the improved portion of the city, and appropriate a street, or any portion of a street, in its entire length. Indeed, the uncontroverted evidence is, that "there is a much nearer route to said island, from the terminus of said road in the city of Savannah, than the one now projected for that purpose." It is also represented, that the construction along the nearer route, would be more easy, and cheaper than along the seected route. But it is insisted that this presumption of legislative intention, is rebutted by the express words of the charter, viz: that the company be "authorized to extend their road from *any point at or in the city*, to the island of Tybee." We have shown to what consequences this construction would lead. Let us now inquire, whether or not these words are susceptible of any other construction, entirely consistent with the general intention, and still avoiding a grant of privilege so latitudinary, and so liable to abuse.

When it is considered, that the object of the amendment of the charter was, the extension of a railroad already constructed, and having a terminus within the city, to a designated place, it would seem to me very clear, that the Legislature meant by the words used "from any point (*on said road*), at or in the city, to Tybee Island." That is to say, if it be desirable so to do, the company may make their present terminus, the starting point of their extension ; but if there be any other point on said road, at or in the city, more eligible for said starting point, *that* may be adopted. The idea of *extension*, which is inseparable from the new grant of privilege, in my view, fixes the terminus *a quo* of the road to be built, on the line already constructed. To select a point in the city, not upon it, as the terminus *a quo*, would be to make the proposed road to Tybee, not an extension, which the Legislature manifestly intended, but an independent road, which they certainly did not intend. The counsel for plaintiffs in error felt this, and to escape the dilemma, they argue thus : " The charter permits us to select any point in the city, as the terminus *a quo* of the

road to Tybee; we have selected the head of Lamar's Canal as that terminus, but that is not on our present road—it is quite remote from it; and in order to preserve in the new road the character of *'extension,'* we have, by necessary implication, authority to connect the head of Lamar's Canal with the present road. Hence our authority to appropriate a portion of Randolph street." The obvious reply is, the company have some latitude in the selection of their terminus *a quo,* for Tybee; but that latitude is limited by the character of *"extension,"* which they may not throw off. This is deemed a sufficient reply to the argument of counsel, which was framed to relieve them from the presumption that the Legislature intended their extension should pursue with reasonable strictness, the nearest route to the terminus *ad quem.* This presumption rests upon the fact, that the nearer a railroad approximates to a right line, between its termini, the less will be its interference with private rights, and this desideratum the Legislature is supposed to connect with the principle, that private right, and must yield to public interest.

Thus it will be seen, our construction of the Act of 1861, authorizing the extension of the Savannah, Albany and Gulf Railroad to the island of Tybee, is that the Legislature intended, *first,* that the starting point should be some point *on the road,* already constructed, "at or in the city of Savannah;" and, *secondly,* that the course should be laid thence, with reasonable directness to Tybee Island. This would render the longitudinal intersection of any street unnecessary, and our conclusion is, therefore, that they did not intend to grant that privilege. If we be right in this, the implication claimed by the plaintiffs in error fails.

We go further. If resort be had to implication, it will be found adverse to the claim of the company. The third section of the Act of 1861 provides " that at the crossings made by the company, of any way of travel or commerce, whether on land or water, the said company shall construct such adequate works as will leave the same free to the unobstructed enjoyment, and use, of all persons." A street of a

commercial city is a way of travel and commerce. Yet, in the Act there is no safeguard provided against undue obstruction, in case of longitudinal intersection of a street—no limitation of the breadth of ground to be occupied in it, or of the grade to be adopted—no provision for occasional crossing, from side to side, of any street so intersected. To our minds, this is suggestive that the Legislature contemplated no such intersection, as necessary to the proposed extension. In the Mayor vs. The Macon and Western Railroad company, (7 Ga., 221,) this Court held that, " in the construction of statutes, in derogation of common right, and in favor of corporations or particular persons, care should be taken not to extend them beyond their express words or clear import."

In The Justices of the Inferior Court, etc., vs. The Griffin and West Point Railroad company, (9 Ga., 475,) it was decided that " a grant to an individual or a company, which is in derogation of common right, is to be strictly construed. Even where there is ambiguity in a charter, as to the extent of the powers conferred, the doubt shall operate in favor of the public, and against the grantee." And again, "a plank-road company, under authority to construct a plank-road between two designated points, have no right to appropriate to that purpose the whole of a public highway, without express authority in their charter." And again, " where the charter authorizes the company to locate their road upon any part of a highway where it becomes necessary so to do: *Held*, that in such a grant the Legislature did not intend that they should be authorized to appropriate the whole course of any highway." It will be observed, that in the case last quoted the charter authorized the company to use any part of a highway " whenever it shall become necessary." Yet, the Judge of the Superior Court having refused an injunction to restrain them from using a highway throughout its entire course, this Court, on appeal, reversed his decision, and sustained the application for injunction.

In The Inhabitants of Springfield vs. The Connecticut River Railroad Company, (1 Am. Rev. Cases, 572,) which

was a case of application for an injunction against the use of a railroad, already constructed longitudinally through a street of an incorporated town, the Court says, on page 578, "As no company or persons have authority to lay out a railroad, except so far as such power is conferred by the Legislature, the Court are of opinion, that by a grant of power, by legislative act, to lay out a railroad between certain *termini*, where the precise course and direction are not prescribed, but are left to the corporation, to be located between the *termini*, no authority is given, *prima facie*, to lay such road on and along an existing public highway longitudinally; or, in other words, to take the roadbed of such highway as the track of their railroad."

Fully satisfied that the Act of 1861 does not grant to the Savannah, Albany and Gulf Railroad Company authority to appropriate to their own exclusive use a broad belt of Randolph street, throughout its entire length, we pretermit all discussion of the power of the Legislature to make such grant. When the power shall have been exercised, and our judgment upon it invoked, we will give it our earnest consideration, but not sooner.

But it is insisted that the Mayor and Aldermen of Savannah have, in subordination to the Legislature, control over the streets of the city, and have granted to the plaintiffs in error the contested privilege. They argue, that the Legislature having authorized them to extend their road to the island of Tybee, and the Mayor and Aldermen having granted them the privilege of extending along Randolph street, as they are now doing, their right to do so is perfect. They analogize it to the ordinary restriction of the right of way in railroad charters, inhibiting the grantees from invading dwellings and yard enclosures, which say they, although prohibited, may be done by consent of the proprietors. This involves an inquiry into the powers of the Mayor and Aldermen, in the premises ; and I remark, that to make the analogy perfect, it must appear that the Mayor and Aldermen are invested with the absolute, unqualified fee in the streets. The question here arising has a double aspect. It

is alleged in the bill, and not controverted, that Randolph was not originally a street of the city, but was laid out and dedicated to that use by the then proprietors of the land, with the motives and for the purposes set forth in the bill. Our learned brother in the Court below considers it a public street, to which the public generally, and the city authorities especially, bear the same relation as to the streets laid out in the original plan.

What, then, are their powers over the streets generally? In the charter of the city granted May 1, 1760, we find the following clause: "That the common appertaining to the said town, [here are stated the boundaries,] including all the squares, streets, lanes, and passages, described in the plan of said town, in the Surveyor General's office, and have been accustomed, or made use of, by the inhabitants of said town, shall be and continue the common property of the inhabitants of said town, and shall not be aliened, or granted away, for any purpose whatsoever, than by Act of the General Assembly." Commissioners were appointed to carry that Act into effect. The Act, I believe is regarded as the original charter of the city of Savannah, improved by subsequent enactments. "By the Act of 1787, a President and Wardens were to be chosen, who were empowered to make by-laws and regulations for the government of the town, and to lay assessments and taxes, etc."

By the Act of 1789 the town is named and styled "the City of Savannah;" a Mayor and Aldermen are directed to be elected, and who are declared to be a body corporate and politic, with power of acquiring and holding real and personal property for the use and benefit of said city.

At page 342 of R. M. Charlton's Reports there is a decision, made in 1830, by one of our most learned and accomplished Judges, (no stranger to the case at bar) in which this subject is reviewed, and from which are taken the above references to the Acts of 1787 and 1789. In that case the following points seem to have been decided:

1. That by the Act of 1760, the titles to the streets, lanes, squares, etc., of the city passed irrevocably from the sover-

eign power, with a restriction or limitation as to the grantee's power of alienation.

2. That there was created by that Act no body-politic or corporate capable of taking and holding lands.

3. That the title to the property, before enumerated, passed to the lot-holders, not as individuals and tenants in common, (because this would be destructive of the very end and object of the grant, since each one would be entitled to a partition) but in their collective and aggregate character, as a corporation *sub modo*.

4. That the Act of 1787 made the president and wardens, elected under it, a body-politic and corporate, in whom, by operation of law, the title to the property granted to the lot-holders, in their aggregate character and for their public use and enjoyment, became vested.

5. That when, by the Act of 1789, the town was regularly incorporated, this public property became, by like operation of law, vested in the artificial person thus legally constituted.

6. That it is so vested with this limitation that "*the corporation cannot alien or grant the public property for purposes different from the object of its original appropriation.*"

Reviewing this legislation, with an eye to intention, and a purpose to adopt the construction best calculated to effect it, I incline to accept the conclusions of the learned Judge who pronounced this opinion. The three Acts are in *pari materia*, and must be construed together. There being nothing in the two latter to abrogate or qualify the prior limitation upon the power of alienation stated in the sixth point, (which is a literal quotation from the opinion) that limitation remains in full force.

Now, what have the Mayor and Aldermen done? They have granted away sixteen feet, in breadth, throughout its entire length, of Randolph street, to a corporation, for the purpose of laying a railroad track from a higher to a lower point, at a grade of thirty feet to the mile. The result (in perfect consistency with the grant) is, that on certain portions of the line sixteen feet have been or are being excavated to the depth of twenty to twenty-five feet; and on other por-

tions, have been or are being covered by an embankment twelve to fifteen feet high. Thus has this portion of the street been obliterated *as street.*

On the supposition that the corporate existence of the railroad company will expire with the limitation in its original charter, and the portion of the street thus disposed of revert to the prior owners, (the most favorable contingency for the inhabitants) the result will be that two or three generations will have been deprived of their easement in, or (to adopt the language of the charter,) " the accustomed use of," that portion. But in another view, upon the hypothesis that the charter of the company will be renewed from time to time, (much the most probable result) that portion of the street will have been granted away forever. We speak of it as granted away, because it is not only appropriated to, but authorized to be either removed, or buried, by the corporation. If the object be carried out, that belt of the street will be as effectually gone as if by a convulsion of nature a chasm had opened, and so much of the street had sunk into the bowels of the earth. It is not enough that certain portions of the street remain to bear its name, or to serve an imperfect use; for the prohibition was designed to preserve as well the aliened as any other portion. It is no answer to say that, in an enlarged view, the street in its altered state will subserve in a much higher degree the purposes of travel and transportation; for we are now discussing the *validity* or *legality* of the grant in virtue of which the improvement is to be wrought. Courts can never adopt the unsound ethical maxim, that "the end sanctifies the means."

The case is very different from the laying of a railway upon the surface of a street, so that, except at the instant of the passing of a train, vehicles, and horsemen, and footmen, may pass freely in and across the street. In that case, *the street remains,* is open, free. In that case, a new use is made of the street, without abridging its ancient use. This may fall within the proper range of municipal regulation, and we must not be understood as holding that the grant of such a privilege would transcend the powers of the Mayor and Al-

dermen. No case similar to this has been cited in the argument, and we know of none such. The case of Hamilton vs. The New York and Harlem Railroad Company (9 Paigis S. C. Reports, 170,) is certainly very different. There the company had express authority from the Legislature, and there " the track (says the Court) is laid upon a level with the surface of the pavement, leaving the whole street perfectly free for the passage of carts and carriages of every description for the whole width thereof, except at the moment when the railroad cars are passing upon the track in the centre of the street." I have not access to 7th Barbour, containing Drake vs. The Hudson River Railway, but Redfield refers to it in support of this proposition : "A railway may use the public streets for their vehicles, by license from the city authorities, when such use does not unreasonably abridge the public use of such streets for other purposes." If this be the ruling, it is no authority for the plaintiffs in error in this case. I infer that there, also, the track was on a level with the street.

I am satisfied that no case can be found in which the Courts have sanctioned the thorough and entire exclusion of the public from the use of a continuous belt of a street, from end to end, with such a provision in the municipal charter as exists in this case, solely upon a grant from the municipal authorities. Were there such, the well established reputation for learning and research, of the distinguished counsel for the plaintiffs in error, would have ensured it adduction.

If it be said that there is in this case no *alienation* of the street, or any portion of it, the reply is, *first*, that although not a technical alienation, it is such a disposition of the land, as authorizes its exclusive appropriation, its removal to a considerable depth—or its covering with superincumbent earth to a considerable height, accomplishing all the public detriment of formal alienation, for an indefinite time, perhaps for all time. *Secondly*, it is a *grant* of privilege, embracing authority to remove the land itself, which is literally in the language of the charter, "granting away" a portion of the street. In any view, it creates a public nuisance.

The case of the Mayor and Council of Columbus vs. Jaque *et al.*, (30th Georgia Report 506) is in point. The obstruction proposed to be placed in the street, was different, and the restriction in the charter of the city was different; but a comparison of the cases will show clearly, that the legal principles applied by the Court, in that case apply with augmented force to this.

In each case, the proposed work amounted to a diversion of a portion of a street, from customary use and enjoyment by the inhabitants, and created a nuisance. Each case turns upon the question of power in the city government.

See also the State of Alabama vs. The Mayor and Aldermen of Mobile, 5 Porter, 279.

Thus far we have considered the case in the aspect most favorable to the plaintiffs in error; we have treated Randolph street as having no more sacred character than any other street of the city. But are not the peculiar equities set forth in the bill, deserving the protection of the Court of Chancery? It is true, that upon a final hearing, on an issue made by the pleadings, as to their existence, we should incline to require higher evidence on the point.

It neither appears that there was, nor that there was not, any dedication of this ground as a street by *deed* to the Mayor and Aldermen upon certain trusts. Nor does it appear that in the conveyances of N. J. Bayard and others, to the purchasers of lots abutting on Randolph street, there were covenants assuring to them, the perpetual use of the street as laid out. There are no exhibits of any documents. But the allegations are very distinct and positive, and amount to this—that the dedication of Randolph street, was designed to promote the sale and enhance the price of the lots, and had that effect—that this effect, was the result of an assurance that the street was set apart, and to be kept open, for all time, to its full dimensions—and consequently that the complainants in the bill, who are the purchasers, or their successors, in title, paid the price of the dedication, upon the faith of that assurance.

The defendants below, neither answered the bill, swearing

The Savannah, Albany and Gulf R. R. Company *vs.* Shiels.

off this equity, nor offered *aliunde* evidence refuting it. Those allegations therefore were uncontroverted, and for the purposes of the hearing, were properly taken as true.    Is there no equity arising from them to support an injunction, *pendente lite?*   May not a municipal corporation take a conveyance or receive a dedication of land, upon trusts, entirely harmonizing with, and promoting the general design of their creation.

We have seen, that there is a perfect coincidence between the trusts set up in this bill, and the charter powers of the Mayor and Aldermen over the ancient streets of our venerable emporium.

We remark here, on this branch of the subject, that the equity of the complainants, is not at all affected by the willingness, or even the desire of other owners of lots abutting on the street, and having the same, or similar equities, to have the work in progress completed.   *They* may have other interests, which will be so far promoted, as to more than compensate for injury resulting from this serious abridgment of their easement in the street.

The cases cited from 7th, 9th and 30th Georgia Reports, and from 5th Porter, fully establish the jurisdiction of Chancery to relieve, by injunction, in such cases—and the two last mentioned, fix upon such obstructions, in the street of an incorporated city, the character of public nuisance.    Authorities on both points might be multiplied, were it deemed necessary.

It will be perceived, that we not only sustain the judgment below, granting the injunction, but go further, holding that the complainants would be entitled to it, even though there were room allowed on each side, between the railroad and the curb-stone, for vehicles to turn in, or to pass each other.   We express this opinion, not only because the argument covered the whole ground, but because the Chancellor and the counsel on both sides seemed to desire it.

The judgment is affirmed.