CRAWFORD *et al. vs.* THE MOBILE AND GIRARD RAILROAD COMPANY.

[Crawford, Justice, being disqualified, did not preside in this case.]

1. By the act of 1827, making provision for laying off a town in the Coweta Reserve on the Chattahoochee river, and the act of 1828, incorporating the town of Columbus, a dedication of the common included in the twelve hundred acres so laid off to the use of said town was made, not in the sense of common of pasture, estovers, etc.; but in the higher sense of a common appurtenant to the town, and for the advancement of its interests as a town, and among other interests, its commercial prosperity.

2. Where the city authorities of Columbus gave to the Mobile and Girard Railroad a certain piece of ground in said common for the purpose of a depot and yard, etc., necessary for its change of terminus from Girard, in Alabama, to Columbus, in Georgia, on its invitation or demand, in view of the Columbus subscription of stock therein, and where the franchise to move into Georgia was authorized by an act of the general assembly of Georgia empowering the Alabama road to connect with the Georgia Southwestern at Columbus, such use of the common by the city authorities, tending, in their judgment, to its commercial prosperity, was not inconsistent with the great purpose of the grant of the common to the town for the uses for which it was dedicated, and such buildings as are necessary for the depot and appurtenances were not included in the restrictions then imposed in respect to houses, buildings, etc., in the original acts of dedication.

3. When, by the act of 1873 the general assembly vested title in the plaintiffs to the common for the use and benefit of the city, the said plaintiffs took the title of the state subject to such legitimate uses of

the common as the city had previously authorized, and among these legitimate uses is the permission or grant to devote part thereof to railroad purposes as promotive of its commercial prosperity.

4. If the legal title had not been put in any persons for the use of the city before the act of 1873, the legal title then granted inured to the benefit of the city, the beneficiary of the original grant, and those to whom the use, in the line and purpose of the original grant of that beneficial interest, had been granted by the city, though the title so then vested restricted the uses not previously granted to other purposes defined and limited in that act.

5. But the legal title, or at least the right to manage the common for the interests of the city, was certainly in the mayor and council—at least until the will of the general assembly thereon was indicated; and such right to manage the common, as well as the legitimate disposition thereof before the change of managers by the act of 1873, it was not the intention of that act to make invalid and illegal; but its true intent and purpose was in respect to the common still left as common at the date of that act.

6. That act being in accordance with the will of the city authorities, and their assent for the city being had thereto, passed the title to the commissioners as to all the common not theretofore appropriated to specific purposes by the city authorities.

7. The act of the military mayor and council, ratified by the constitution of the state and subsequent recognitions of it by the mayor and council duly elected, passed the right of the property sued for into the Mobile and Girard Railroad Company.

Municipal Corporations. Title. Commons. Laws. Powers. Railroads. Columbus. Before Judge WILLIS. Muscogee Superior Court. May Term, 1881.

Crawford *et al.*, commissioners of commons of the city of Columbus, under the act of 1873, brought ejectment against the Mobile and Girard Railroad Company to recover the following land: " A part of the commons, east of the city of Columbus, commencing on the extension of Bryan street, of said city, at the northeast corner of the land occupied by the Southwestern Railroad Company, and running east on the extension of Bryan street six hundred feet, thence south twelve hundred and eighty-one and eight-twelfths feet, thence west six hundred feet, thence

Crawford *et al. vs.* The Mobile and Girard Railroad Company.

north twelve hundred and eighty-one and eight-twelfths feet to beginning point."

In addition to the general issue, defendant filed a plea stating the following facts:

First. That by an act of the general assembly, approved December 24th, 1827, and another approved December 19th, 1828, the land sued for was dedicated to the town or city, and the title thereto was vested in the municipal authorities, for the benefit of the public.

Second. That by an act of the general assembly, approved December 21st, 1857, the authorities of the Muscogee Railroad and the Mobile and Girard Railroad were authorized to connect their tracks by extending them through the streets and commons of the city of Columbus, with such side-tracks, turnouts and sheds as might be necessary; and that under this act the mayor and council, on the 8th of March, 1858, did give the consent of the people to the connection; and that afterwards the mayor and council, by several ordinances, granted to the Mobile and Girard Railroad the premises and land claimed, upon which to erect side-tracks, turnouts and sheds, upon condition that said railroad should not charge storage on any goods received or deposited, and their property should always be subject to assessment and taxation as other property in the city; and that defendant accepted the terms, and its property has been assessed for taxes every year since, although exempt under the act of 1873; and that it has paid $3,000.00 taxes to the city not required by law.

Third. That defendant accepted the grant of the city of February 1st, 1869, and on that day took possession of the land, and has held it adversely ever since; and that the value of the land is not more than $3,000.00, and at the time of the grant not more than $1,000.00.

Fourth. That all the title the plaintiffs have is derived from the act of the legislature, approved February 18th, 1873; that said act was passed at the instance of the mayor

and council of the city of Columbus; that they are the beneficiaries under said trust; and they having heretofore granted their interest to the defendant, that defendant is entitled to the possession thereof; and the plaintiffs, as trustees of their grant, are estopped from disturbing its possession; that if they are not so estopped, then the plaintiffs can only recover by paying to the defendant the amount it has heretofore paid to the city in taxes.

On the trial the evidence disclosed, in brief, the following facts: The city of Columbus was originally laid out in accordance with the acts of 1827 and 1828, from a certain tract of land belonging to the state and known as the "Coweta Reserve." By the original survey the town was divided into blocks, and streets were laid out; but on the outskirts of the town, so planned, there was a considerable amount of land not divided into streets and lots, but marked on the map as "town commons." The land in dispute formed a part of what was known as the "East Commons."

In 1851 the following agreement was made between the mayor and council of Columbus and the defendant, then the Girard Railroad:

"The mayor and council agree to subscribe to the capital stock of the Girard Railroad Company the sum of $150,000.00 in corporation bonds, bearing interest at the rate of 7 per cent.; and the railroad company agrees to apply the proceeds of the bonds to the purchase of iron for the road-bed from Columbus to Chunnenuggee. The city council reserves the right to build a depot in the city, and a bridge over the Chattahoochee river, and connect the depot with a line of track over the bridge, to the line of the Girard Railroad, on west bank of the Chattahoochee; and the railroad company agrees, when this is done, to run their trains into the city, to receive and discharge freight at the depot. The amount expended by the city in building the bridge and depot, shall be considered a subscription to the capital stock of the railroad, for which the road shall issue certificates; that when the certificates are delivered, the depot and bridge shall be the property of the railroad."

In 1857, the legislature passed an act allowing the Muscogee (now Southwestern) Railroad and the Mobile and

Girard Railroad to connect their roads by running a track, or tracks through the streets and commons of the city of Columbus, first obtaining the consent of· the citizens thereof. On March 8th, 1858, the mayor and council of Columbus entered into the following agreement with the defendant :

"STATE OF GEORGIA—Muscogee County.

WHEREAS, the legislature of the state of Georgia, at its last session, passed an act authorizing the president and directors of the Muscogee Railroad Company and of the Mobile and Girard Railroad Company and of the Montgomery and West Point Railroad Company to connect their roads by running a track or tracks of their said roads through the streets and commons of the city of Columbus, first obtaining the consent of the citizens of Columbus ; and, whereas, the mayor and council of the city of Columbus, at a regular meeting on the 15th day of February, 1858, passed the following :

' *Resolved,* That the Muscogee Railroad Company shall have permission to connect with the Opelika Railroad.   *   *   *   *   *

*Be it further resolved,* That permission is hereby given to the Muscogee Railroad Company to build a bridge across the river, and to pass through Thomas street and through the east commons, and connect with the Mobile and Girard Railroad at any convenient point : *Provided,* said company shall establish on or near Broad street, at some point to be designated by council, a permanent passenger depot ; and further, that the construction of the bridge, depot, and all other expenses necessary to its connection, are not borne, or any part thereof, by the city ; *and provided further,* that said company shall not cross said streets and commons at a rate of speed exceeding four miles per hour ; and that an election be held, in which shall be submitted the question of connection on the basis of the report of the committee.'

And whereas, in pursuance of said resolution, an election was held at the court house in the city of Columbus, on February 27th, 1858, at which the question of 'connection' and 'no connection' was submitted to the people, and a majority having voted for 'connection,' now, it is agreed between mayor and council of the city of Columbus, representing the citizens of said city, and the Mobile and Girard Railroad Company   *   *   *   *   *   *   *

And the said mayor and council of the city of Columbus, by the authority of the act of the legislature, and the will of the people expressed as aforesaid, doth give, grant and convey to the Muscogee Railroad Company. and to the Mobile and Girard Railroad Company, the right, power and authority to connect their said roads, to-wit :

The said companies, or either of them, shall construct a permanent bridge across the Chattahoochee river, so that the abutment of same shall be on Thomas street, and shall lay down and use a single track on Thomas street, through said city, to the east commons    *    *    * And said company shall have the privilege of running said railway from the east end of Thomas street, through the east commons, to the depot now erected, or to any depot which may hereafter be erected on the grounds of the Muscogee Railroad Company ; and also to connect by any other track with said Muscogee Railroad, through said commons, at any point east of the city, when the convenience of said companies may require the same to be done    *    *    *    *

It is further agreed and understood that the said Muscogee Railroad Company and Mobile and Girard Railroad Company shall make no connection of their said roads, or permit the same to be done, in any other place, way or manner than is herein authorized and provided for."

On May 25th, 1868, the mayor and council were displaced by military order, and others appointed in their stead ; William Mills, captain 16th United States infantry being appointed mayor. On July 27th following, Mills retired and requested Mott, a member of this appointed council, to act as mayor. On February 1st, 1869, this council, on petition of W. M. Wadley, president of the Mobile and Girard Railroad Company, for the privilege of locating a depot on the east commons of the city, adopted the following resolution :

"*Resolved*, That so much of the east commons be and is hereby granted to the Mobile and Girard Railroad Company, for the sole purpose of erecting thereon a depot and the necessary buildings appertaining thereto, as is situated immediately east of the present depot grounds of the Southwestern railroad [here follows a description of the land sued for] ; the said ground to be held and used by said railroad company for no other purpose than a railroad depot, otherwise to revert to the mayor and council of Columbus, with all improvements thereon. The said company shall also be prohibited, forever, from charging storage on any goods received or deposited at their depot. The property of said company shall, also, always be subject to assessment and taxation by the city, as other property in the city.

*Resolved, further*, That the said Mobile and Girard Railroad Company shall have the privilege of access to the above described lot of ground by all necessary and proper tracks, thereby connecting their present line across the Southwestern railroad track over and through the east commons of said city to said grounds."

Also, by resolution, March 1st, 1869, the same council amended the grant, so as to give the railroad company the privilege of egress from said grounds, over the commons.

The depot of the defendant was on the west or Alabama side of the Chattahoochee river until 1869. In that year a bridge was built across the river, the connections completed between the defendant's road and the Muscogee (now Southwestern) road, and the defendant arranged to use a portion of the warehouse of the Southwestern road. Defendant was unable to build a depot at that time upon the land granted to it. In 1872 one or two small houses were erected by the defendant upon the land in dispute, and a fence built around them. They have since been used as an oil shop and oil house. In 1873 defendant built a fence around the land in dispute, but it has since rotted down and people have passed across this land as over other portions of the common. Defendant has paid taxes on its road, bridge and track regularly. It has paid no taxes on the land.

In 1880 the defendant proposed to build a track branching off from the track of the Southwestern railroad and running into the land in dispute, and connecting with the track of the Western railroad. This proposed track was not for the purpose of connecting the defendant's road and the Southwestern road, as that connection had already been made on the west side of the Southwestern railroad track, while the land in dispute and the proposed track running into it were on the east side of the Southwestern railroad. The Southwestern railroad has been leased by the Central railroad, and defendant's road is under the same general management.

In 1873 the legislature, with the assent and at the instance of the municipal authorities, passed an act creating a board of commissioners of commons for the city of Columbus, and the plaintiffs are the parties appointed by that act, or their successors. A committee was appointed by them to ascertain by what au-

thority certain portions of the commons were held by the different railroads, what amount of commons was held by the city for cemeteries, and by what authority, and whether any arrangements could be made with the railroad companies to change their depot grounds. A report was made by this committee, setting out that a grant had been made by the council of certain land in 1847 to the Muscogee, now the Southwestern Railroad Company, for the purpose of locating a depot, and for no other purpose; and also the grant to defendant above stated, in 1869. If the land in dispute is used as contemplated, it will prevent the opening of several streets which have been laid out by the commissioners of commons, who have had a survey made of the commons, including this land, have had avenues run through it, and have sold lots north and south of it. There was some other testimony, which is not material to an understanding of the points decided.

The jury found for the defendant and judgment was entered accordingly. Plaintiffs excepted, and assigned the following among other errors:

(1.) Because the court charged as follows: "Under the act laying out this town, what was known as the commons was dedicated by the state of Georgia to the city of Columbus as a common and to be used as commons, and the title to that property then went from the state of Georgia to the city of Columbus, or its authority. The only right that the state reserved, under that act, was the right to see that this property was used for the purposes for which it was dedicated; and so long as the city of Columbus used it for the purposes for which it was dedicated, the state of Georgia had no right or control over it."

(2.) Because the court charged as follows: "Then I tell you, that the act of 1873, which is relied upon by the commissioners as their title in this case, vested no title in them; for the reason, that the title which the state of Georgia had to this property, had been previously vested by the State in the city of Columbus."

(3.) Because the court charged as follows: "Plaintiffs insist further in this case that the city of Columbus had no right to dispose of this property, except by act of the legislature. That I tell you is true. They had no right to dispose of the title to this property, except by act of the legislature, for any purpose that was inconsistent with the purposes for which it was dedicated. And the purposes for which it was dedicated were not that it should remain for them as a common, or as a pasturage for cattle; but that it should be used by the city of Columbus as a common until it became necessary, for the benefit of the city of Columbus, to change it for some other purpose. And under that dedication, the city of Columbus had the right to use it, as I said to you, for any purpose not inconsistent with the purposes for which it was dedicated. For instance, if they saw fit to dedicate, to suffer, or allow any portion of it used as a cemetery, they had a right to do it. That would not be inconsistent with the authority under which they held it. And suffering a portion of it used as a hospital, would not be inconsistent with the power under which they held it. Suffering a portion of it used by a railroad company, under a contract with that company that they would build depot buildings upon it, and run their trains into this city for the benefit of this city, would not be inconsistent with the rights, with the powers under which they held it."

(4.) Because the court refused the following charge: "The city council of Columbus, known by its corporate name, the Mayor and Council of the City of Columbus, is but a creature of the law, called into existence for the purpose of administering the government of the city of Columbus under certain laws and regulations. It has no power to hold the title to any real property, except such as may be necessary for the administration of the city government, and could consequently not convey the title to any property it was not authorized to hold."

(5.) Because the court refused the following charge:

" Under the law, no person had a right to erect a building on the commons belonging to the city of Columbus. And if the jury believe from the evidence, that the land in controversy was a part of the commons as originally set apart, and a grant or gift was made by the municipal authorities to the railroad company, for the purpose of erecting buildings thereon, then said gift or grant was invalid and void, and the railroad company took no title by the gift or grant."

(6.) Because the court refused the following charge : " Under the laws of this state, no person had a right to erect any house on any part of the land known as the common, belonging to the city of Columbus. And if the jury believe from the evidence that the city council of Columbus granted to any person permission to erect buildings thereon, such grant was invalid, and such act was a usurpation of authority, and the grantee thereunder took no title thereby."

(7.) Because the court refused the following charge : " If the jury believe from the evidence that prior to 1873 the state owned the land in controversy, but that in 1873 the legislature passed an act vesting the title of the land in trustees, who are the plaintiffs, to be sold for the purpose of extending the area of the city, and that the land has not yet been sold, the trust is executory, and the plaintiffs are entitled to recover the land for the purpose of executing the trust; and if the defendants have any legal or equitable claim for taxes paid in consideration of a grant made them by the city authorities, of said land, they can follow the proceeds of the sale of the land, and be reimbursed for the amount of taxes so paid, after the sale is made."

(8.) Because the court refused the following charge : " If the jury believe from the evidence, that in 1869 the city council of Columbus, by legal enactment, granted to the Mobile and Girard Railroad Company the privilege of locating a depot on the commons or vacant land east of the

city, known as the east commons, and set aside the same by metes and bounds; and that no such use was made by the company up to 1873, at which time the legislature of Georgia passed an act, that became a law, vesting the title of the commons in trustees, to be sold for the use of the city; and no such use has been made of the land by the railroad company before the commencement of this suit, then the plaintiffs are entitled to recover the land."

(9.) Because the court refused the following charge: "To enable a person to acquire title by prescription and occupancy of land for seven years, under color of title, it is necessary that the occupancy be open and adverse. It must be continuous, and consistent in character with the writing under which he holds."

(10.) Because the court refused the following charge: "Possession of land is manifested, among other ways, by enclosure. When one takes possession of land, and manifests such possession by enclosing it, and does not live on it, or exercise acts of control over it otherwise, and suffers and permits such enclosure to decay or be taken away, and does not renew and keep up the enclosure for seven years; then, although he has color of title, it is not such possession as will enable him to hold it under a claim of prescription."

W. A. LITTLE, for plaintiffs in error.

PEABODY & BRANNON; BLANDFORD & GARRARD, for defendant.

JACKSON, Chief Justice.

This is an action of ejectment brought by the commissioners of commons for the city of Columbus, appointed and empowered to control the said commons by an act of the general assembly of 1873, to recover from The Mobile and Girard Railroad Company a certain parcel of land, alleged to be part of the commons and to be illegally held

by that company. The question is, are the plaintiffs enti-tled to recover, or in other words, is the title in them, or did it legally pass out of the city of Columbus into the defendant prior to the act of 1873?

Title was vested in the plaintiffs to the commons by the act of 1873, and thus the question arises whether at that date such title to the portion of it now sued for was in the state as to enable the legislature to grant it to the commissioners; or rather, perhaps, in construing the act of 1873 to authorize the conclusion that the legislature inten-ded by it to interfere with the parcel of land in dispute?

1. To elucidate this point, it is necessary to examine the original acts by which the site of the city of Colum-bus was provided for, and the act incorporating that city as the town of Columbus. These acts were passed in 1827 and 1828, and are to be found in Dawson's Compilation, pp. 470 and 474.

It seems to us quite clear, from a fair and full examina-tion of these statutes, that the state dedicated to the use of Columbus the land set apart for the town, including therein the entire tract of twelve hundred acres, the por-tion left as commons as well as the streets laid out and the lots which were to be sold and conveyed, as therein enacted. What was not sold was made a common for the benefit and use of the city especially. For what uses? Certainly not as a mere common of pasture, or estovers, or other narrow and agricultural and household uses, but for all the great purposes for which the grant was espe-cially made and the town incorporated. A cemetery is a necessity to a town. As it grows into city proportions, a park is of vast importance for health and recreation. These commons could be legitimately used for these and similar objects, and we cannot suppose that the general assembly designed to interfere with such use by vesting title to the common in these commissioners. The primary purpose, however, of the selection of this site for a town and the dedication of a common for its benefit, appears

clearly to have been commercial. The title of the act of 1827 calls the future town a trading town. It is entitled "An act to lay out a trading town, and to dispose of all the lands reserved for the use of the state near the Coweta falls on the Chattahoochee river, and to name the same."

The body of the act is equally explicit in regard to trade and commerce as the special object in view by the general assembly. The first section of it concludes the question and excludes all doubt in regard to the intention of the law-makers. The commissioners appointed to select the site and lay out the town, are to have special regard to commerce and commercial prosperity. It provides for the appointment of five commissioners, to "select the most eligible site, and cause to be laid out and distinctly marked on the reserve aforesaid a town, upon such plan as they may devise and approve, having special regard to the future commercial prosperity of said town and the health of its inhabitants." So prominent in the view of the legislators is the future commerce of the town that that object is coupled with and put on a par with the indispensable and overshadowing necessity of a regard to the health of the inhabitants.

Assuredly no argument is necessary to show that railroads are an important element in facilitating trade, and in these times are essential to commercial prosperity.

At the date of these acts public attention was being directed, by the few who ever move in advance of the great army of civilization, to railroads, and in ten years thereafter the South Carolina railroad was built, and the Georgia Railroad was pushing toward Camak and Warrenton, and surveyed and mapped to Athens and Madison. So that it may be that these commercial highways were in the eye of the draftsman of the act when he penned it, and of those who passed it. Whether that be so or not, the future commercial interests of the embryo town were before them prominently, and any use of the

common to advance these interests is in the direct line of the grant and the dedication.

The act of 1828, which incorporated the town thus laid out by the act of 1827 does contain restrictions on the powers of the city in regard to the common, and does prohibit the erection of buildings thereon ; but these prohibitions were designed, we think, to guard against leave to put up temporary buildings under leases, and certainly not to prohibit a grant of the right-of-way over the common—of the right to connect railways thereon, and to construct the depot and other buildings essential to such connection, and conducive to the commercial prosperity of the city.   The plan of the town, as laid out by the commissioners under the act of 1827, was not to be materially altered, and the streets and square for the court-house of the county of Museogee, and other common, were not to be encroached upon by the erection of buildings or otherwise ; but the common was still subject, we think, to the great use for which it was first dedicated, to-wit : the use of a trading town, and the use in such way as to advance its commercial prosperity.   See Dawson's Comp., p. 475 ; sections 3, 4, 5, 6 of act of incorporation.

2. We therefore conclude that the city authorities of Columbus could use the common for railroad purposes, because such use is in the direct line of the original grant. Therefore when they did so use a part of it in order to provide a place for the Mobile and Girard railroad to enter and locate a terminus within the limits of Columbus, instead of keeping that terminus on the Alabama side of the Chattahoochee river, they did a good thing to promote the advancement of this trading town and to increase its commerce.   The only difficulty in the way, it would seem, might have been the want of power in the Alabama corporation to put its foot anywhere on the soil of Georgia; and that difficulty is met by the act of 1857, which expressly authorized that road to connect with the Georgia road, then the Muscogee, now the Central rail-

road. That act is, "That the presidents and directors of said roads shall have the power of connecting their said roads by extending them through the city commons and streets of Columbus, with such side-tracks, turn-outs and sheds as may be necessary for the convenience of freights and passengers: *Provided,* they first obtain the consent of the people of the city of Columbus, upon such terms as may be agreed on and shall be satisfactory to them."

The consent of the people through the city authorities was had, the land in dispute given for the purposes of the act, and even if the authorities had been before restricted in the use of the common, so as not to permit railway buildings to be erected thereon, and if the argument in regard to the original object and use of the common be untenable, it would seem that this act of the general assembly, and of the city under its grant of authority, would conclude the case against the plaintiffs. If the title remained in the state, by this act the city's consent passed it out into the railway companies. Title was vested in them by the holder of the legal fee, if it was in the state, and by the usee, if only that interest was in the city, and why it is not a perfect title, we are at a loss to see. Surely it is unnecessary to show that this right to connect the roads and to have "such side-tracks, turnouts and sheds as may be necessary for the convenience of freights and passengers," includes houses, roofed and protected from weather, depots of the usual sort, and the yards adjacent and convenient for passengers and freight, and to show that the extent of ground necessary for such objects is left to the terms to be agreed on by the city and the railroad companies expressly alluded to and authorized by the proviso above cited.

3. What, then, is the scope and effect of the act of 1873? It passed the title of the state to the common, which had not been before that act disposed of by authority of the act of 1827 for the advancement of commerce, and the act of 31st December, 1857, authorizing the connection of

the roads, and all other uses to which the common had been previously put, if in accordance with the purpose of the grant, such as hospitals for health, cemetery for burial purposes, water-works, and everything promotive of the health and commercial prosperity of the town.

The title to that part of the common undisposed of is vested in the plaintiffs, but that disposed of for other legitimate objects, is where that legal disposition has put it. In this case, in respect to this land here in dispute, a prior legal disposition of it had put the title in the defendant, and there it abides.

4. But even if the legal title had never been in any person for these uses of the city prior to the act of 1873, it was then put in these commissioners for the use of the city, and when it got in them for the use of the city, and the city, the usee, has used it for beneficial and legal purposes, shall the mere legal holder dispossess those who held under the usee for legitimate uses, at the time they acquired their right? Even though the act of 1873 thereafter restricted the uses, and excluded this use now under consideration so far as future acts are concerned, still, as to past transactions, it would seem inequitable to wipe them out by a sweep of the legislative pen, doubtful whether it was so intended, to say the least, and trenching on vested rights if so intended. The legal principle would be applicable that he who conveys, having no title, if afterward he acquire it, shall not use the after acquisition to the destruction of his former deed, but the newly acquired title will inure to the purchaser and perfect what was lame. As this recovery would be for the city, as the real interest is in the city, and these commissioners are mere stakeholders for it, the newly acquired title for the city's benefit cannot be used to destroy what she before permitted and received value for, or put other people to expense about.

5. It is clear, however that may be, that the management, the control of the common was in the city author-

ities, the usual city authorities, the mayor and council, until the change made by the act of 1873. And their acts were legal, at least until the will of the legislature was expressed; and that will never has been expressed contrary to this use of the common or this part of it. Because the true intent and meaning of that act is to vest title to the common which was then common, and not to parts of it no longer common, but parted with to promote that interest for which the very town and common were created and dedicated.

6. Even if the title had been in other city authorities to the common, still common in 1873, the legislature, it would seem, would have the right to vest it in these commissioners; and this would certainly be so, if done at the instance and with the consent of the mayor and council, which was had.

7. In regard to the military mayor and council, it is enough to say that their act seems to have been ratified or acquiesced in by the subsequent action or silence of legally and peacefully elected officers of the city, and confirmed by the constitution of the state of 1868.

We do not see, therefore, force in that objection to defeat the defendant. It is true, that a narrow construction of the constitution of 1868, Code, §§5151, 5152, might not extend its shield over this particular act done subsequently to the adoption of that instrument; but the council had been appointed before, and the act of appointment is the main matter complained of. They remained in office, everybody acquiescing, until the next regular election, and the spirit and effect of the two paragraphs cited is to make their action, until they were superseded by a regularly elected council, valid and legal. These provisions therein, in the language of that constitution itself, "shall be construed as acts of peace and to prevent injustice." See Code §5152 above cited.

If this act, because done after the adoption of that constitution be invalid, then all other acts done during the

same time—from the adoption of that constitution until the next council was elected—would also be invalid, and anything rather than peace and the prevention of injustice would result. Law suits and the overthrow of other rights and titles would follow, and the great purpose of the provisions would be annulled in many instances.

There are other minor points made in the record, but none of them controlling, and it is deemed unnecessary to pass upon them. They go to the admission and rejecting of testimony mainly, and whether admitted or rejected, the result would be the same.

The conclusion we reach is that the title to the common, which was common in 1873, is in the plaintiffs; but that this piece of ground sued for was not then common in the sense of the act of 1873, but had become the property of the defendant, and cannot be recovered. The judgment is therefore right and must be affirmed.

Judgment affirmed.

Cited for plaintiff in error: 2 Dill. on Mun. Corp., 395, 499, 496, 524; Daws. Comp., 470, 474; Acts of 1831, 236; Acts of 1834, 21; Acts of 1835, 55; Acts of 1836, 143; Acts of 1837, 53; Acts of 1840,—; of 1873, 127; 9 *Ga.*, 517; 17 *Ib.*, 60; 45 *Ib.*, 608; 33 *Ib.*, 601; 30 *Ib.*, 507; 4 Pet., 32; 11 *Ib.*, 420; 14 Barb., 511; 1 Miss., 379; 4 Cal., 114; 2 Arm., (Pa.,) 211; 11 M. & W., 827; 33 N. J., 18; Ang. on Highways, 185; Wash. on Eas., 135; 6 Barb., 265; 14 *Ib.*, 512; 26 N. Y., 105; 15 Johns., 452; 79 Ill., 33; 20 Wend., 145; 30 Cal., 379; 31 *Ib.*, 585; 19 Ohio, 514; 26 Wend., 414; 5 Mason, 195; 3 Kent., 432; 27 N. Y., 188; 63 Pa., 489; 16 B. Monroe, 806; 12 Ind., 620; 45 N. Y., 234; 1 Whart., 468; 2 Watts, 25; 6 Whart., 43; 6 Wheat, 593; 3 How., 534; 10 *Ib.*, 511; 7 La.. 208; Cooley Cons. Lim., 294–5; 6 N. Y., 540; 45 N. Y., 234; 2 Dill., 147, 445, 512, 513, 518, 618 *n*; R. M. C.'s R., 342; 16 Pick., 105; 12 Ill., 38; 29 Iowa, 68; 28 Pa., 199; 13 *Ib.*, 555; 26 Iowa, 387; 24 *Ib.*, 445; 22 Mo., 13; 20 *Ib.*, 192; 13 *Ib.*, 610; Code,

§§2186-7; Story Ag., 210-11; 4 How., 554; Hill on Trusts, 159, 535; 1 Whart. R., 468; 2 Watts, 25; 16 Pa., 94; 7 Tex., 300; 7 Ind., 38; 13 Minn., 13.

For defendant: Daws. Comp., 470, 474; 6 Pet., 436, 502; 10 Pet., 713; 12 *Ga.*, 252; 45 *Ib.*, 342, 602; 3 Kent., 563; Code, §2684; 20 *Ga.*, 467; Daws. Comp., 244, 258, 260, 261, 262, 265, 267, 269, 246, 253, 263, 266, 268, 272; Prince's Dig., 549, 560, 561, 563; 1 Ire. Law, 196, 197, 198; Act of 1837, 53; Act of 1840, 187; 33 *Ga.*, 601; 59 *Ib.*, 476; 50 *Ib.*, 451; 51 Ill., 266; 36 Iowa, 357; 4 Metcalf, 564; 1 Whart., 485; 30 Iowa, 94; 2 Smith's Lead. Cas., 172; 2 Harris (Pa.), 190; Acts of 1857; 17 N. Y., 124; 57 *Ga.*. 114; Code, §§5151-2; 57 *Ga.*, 370; Code, §2306; 54 *Ga.*, 231; 62 *Ib.*, 733.