No. 94.—ALFRED SHORTER, *et al.* plaintiffs in error, *vs.* WILLIAM R. SMITH and THE JUSTICES OF THE INFERIOR COURT OF FLOYD COUNTY, defendants in error.

[1.] The ancient doctrine of the Common Law, that the franchise of ferry, although not declared to be exclusive, is necessarily implied in the grant, is inapplicable to both the local situation and political institutions of this country.

[2.] This doctrine had its origin in the feudal system, and has undergone great modification, if it has not been entirely abandoned, even in England.

[3.] Grants by the public are to be strictly construed, and nothing passes by implication.

[4.] The whole legislative history of this State, shows that the understanding of our people has been, that exclusive privileges are never conferred, where none such are expressly given by the charter.

[5.] The Legislature, or the Inferior Court, as its agent, after having chartered a company, to make a particular improvement for public accommodation, without any provision that no rival improvement should afterwards be authorized, may grant a charter to another company or individual, to make an improvement of the same or of a different kind, to afford the like accommodation, however the work of the junior company might impair, or even destroy the profits of the elder.

[6.] It is competent for the Legislature to grant charters with exclusive privileges, but should a change in the business, population and intercourse of the country require it, new avenues may be opened, within the limits of

Shorter and others *vs.* Smith and Justices Inferior Court of Floyd County.

such exclusive grant, by providing just compensation. There is no difference between a franchise and any other property in this respect; all may be made subservient to the public use, provided the public faith be not violated in making adequate remuneration.

[7.] Does a grant to build a bridge, confer a ferry right, and *vice versa?* Quere.

In Equity, in Floyd Superior Court. Decision by Judge John H. Lumpkin, at Chambers, April 12th, 1851.

The plaintiffs in error filed their bill, alleging the following facts : That they were the owners, and in occupation of certain toll bridges over the Etowah and Oostanaula rivers, near their junction at the Town of Rome; that those under whom they hold were, from the time of the first settlement of the country by the whites, owners of the land, and of a ferry privilege over said rivers; and that being the owners, and in undisturbed possession thereof, they did, in 1834, propose to the Justices of the Inferior Court then in office, and to the said County of Floyd, as a consideration for the removal of the County site from Livingston, and its permanent location at Rome, the following terms: 1st. That they would give to the Inferior Court, for the use of the County, one-half of the proceeds of the sale of town lots, on lot of land No. 245, in the 23d district 3d section, and that suitable lots should be selected thereon for a Court-house, jail, academy and three churches.

2d. They proposed to pay to the citizens of Livingston, the actual value of all their improvements made in said town, the improvements to belong to them; the value to be assessed by three respectable and disinterested citizens, the payment to be made out of the first proceeds of the sale of town lots realized by them.

3d. They proposed to keep a free ferry at the head of the Coosa river, for the benefit of free passage of the citizens of Floyd County upon foot and on horseback, except persons passing and repassing to their farms.

4th. The sale of the town lots at the head of Coosa, together with the collection and equal division of the proceeds of said lots, to be under the joint management of the said Court and the company.

These propositions were submitted to a vote of the people of the County, and being accepted by a large majority of the voters, they were ratified by the Inferior Court, and entered on their minutes as a judgment and order of the Court.

Complainants further stated, that all the arrangements contemplated in said proposition were carried into effect, and that the conditions on both sides were performed; that they substituted bridges for ferries, to meet the public convenience, and had been for many years, and ever since the settlement of the County, in the peaceable enjoyment of their franchise. · They claim to have acquired by prescription, a right to said franchise, and moreover, that the agreement between them and the County, above stated, was in full force, and sufficient in law, to protect them from any infringement of their exclusive rights.

They alleged, however, that the Inferior Court of said County, now in office, had passed an order, authorizing the defendant, William R. Smith, to erect a bridge over the Etowah river, within the corporate limits of the Town of Rome, and within one mile or less of complainant's bridge over the same river; which complainants charge, will be an injury to them, and a violation · of their franchise; and they pray that defendants may be enjoined from proceeding further therein. The application for injunction being heard before Judge *Lumpkin*, at Chambers, was refused by him; to which decision complainants excepted.

UNDERWOOD and ALEXANDER, for plaintiffs in error.

McDONALD, for defendants.

Points made by counsel for defendants in error.

Complainants do not show a prescriptive right either for a ferry, or an exclusive right to a ferry.

· To constitute a prescriptive right, the enjoyment must have existed time out of mind. 1 *Black. Com.* 75. 2 *Ib.* 263.

Seven years undisturbed possession and enjoyment of an incorporeal hereditament, presumes a grant. 7 *Geo. Rep.* 352.

This prescription may be rebutted and the right destroyed, by showing the commencement of the enjoyment. 10 *East.* 476. 2 *Brof. & Bing.* 403. *Cowper*, 215. 2 *Wil.* 23.

The bill itself shows the commencement of the enjoyment but it nowhere shows the commencement of a right to have a bridge, nor the continuance of the ferry.

2d. Seven years enjoyment only presumes a grant. It presumes a naked grant from the Legislature. 7 *Geo. Rep.* 351. A grant to complainants does not preclude a grant to defendant, Smith. If complainants be the first grantee and are injured by defendant Smith's bridge, they have no right of action. It is *damnum absque injuria.* 7 *Geo. Rep.* 352. 8 *Peters*, 738. 11 *Ib.* 545, 546.

3d. The complainants set up a ferry right only, and no right to erect a bridge, and show that they have a bridge and no ferry. Authority to build a bridge confers no right to have a ferry, and the right to have a ferry gives no right to erect a toll bridge. 2 *Hilliard on Real Property;* 47, 68. 11 *Peters*, 541.

4th. The complainants show neither a grant nor a prescriptive right to a bridge, nor exclusive right to a ferry.

Prescription is against common right.

The complainants have no right, under their contract with the Court, to set up a franchise against the public. The authority of the Inferior Court to establish ferries, is only permissive. The ultimate control is in the Legislature. They cannot by contract bind the Legislature. They cannot bargain away the power of the Legislature. The Legislature have granted the right. *Act of* 1849.

*By the Court.*—LUMPKIN, J. delivering the opinion.

This is a bill praying for an injunction to restrain the defendants from building a bridge, by virtue of an order of the Inferior Court of Floyd County, across the Etowah river, at the upper end of the City of Rome, and within a distance of one mile or less, from the bridge of the complainants, on the same river. The facts alleged in the bill, are substantially the following:

That the complainants and those under whom they claim, have a prescriptive right of ferry across each of the rivers Oostanaula and Etowah at the head of the Coosa river, and have been in the actual occupancy and enjoyment of said privilege, from the earliest settlement of the country by the whites, in 1830; that being so thereof possessed, on the 26th day of May, 1834, they proposed to the Justices of the Inferior Court of Floyd County, and to the people of said County, that as a part consideration for the removal and permanent location of the public buildings of said County, from Livingston to Rome, they would keep a ferry at the head of the Coosa river, for the free passage of the citizens of Floyd County, on foot and on horseback, except persons passing and repassing to and from their farms; which offer was accepted and ratified with great unanimity by the Court and the County.

That the ferry owners did in good faith, conform to and carry out every obligation imposed upon them by the contract; that, for the greater safety and convenience of the citizens of Floyd County and the travelling public, they have erected on each of said rivers, and within the corporate limits of the City of Rome, safe and durable bridges, at a heavy expense, on which, both rivers are now crossed; and that they have from time to time, reduced the rates of toll to meet the wishes of the people of Floyd County and others, marketing at Rome.

The bill charges, that the agreement is a solemn contract between the Court and County on the one part, and the ferry and bridge owners on the other, by which, the former are bound by a valuable consideration, to continue to the latter, the sole and exclusive use of their franchise; and that the same has been so recognized by all the predecessors of the present Court, and that no attempt has been made to disturb them until recently, and that the present Court are estopped by this uniform recognition, from erecting themselves, or of conferring upon others the right to erect any bridge, or establish any ferry, so near to that of the complainants, as to create a competition injurious to their franchise, or in any other way to injure or diminish the value of the same.

And the complainants insist that the erection of any rival bridge which would deprive them of any portion of their profits and revenues, would be a nuisance to be restrained by injunction.

The bill further charges, that the more effectually to injure the complainants, the defendants are threatening to lay out and establish new roads in such a manner, as to divert the travel from their bridge ; and are giving out that they will not only not charge the people of the County on foot and on horseback, but will permit them to cross their bridge with their wagons, also, free of toll ; and charge only persons who reside out of the County, and even them, at a lower rate of toll than is exacted by the complainants ; the doing of all which, they charge as illegal, and a gross violation of good faith, and an unquestionable attempt on the part of the Court, to exercise power which they do not rightfully possess ; and they, therefore, pray that the said Justices of the Inferior Court may forthwith be absolutely enjoined, from erecting or authorizing to be built, the said bridge, to lay and out said new roads, &c.

In the application for an injunction, notice to defendants was ordered and a day assigned for the hearing ; on which day both parties appeared by their counsel, and were heard upon the question, whether the injunction moved for should be granted. And after two days' argument, the following judgment was pronounced : "The Court refuses the injunction upon the case made in the bill."

The complainants sued out this writ of error.

I approach the decision of this case, with suitable conviction, I trust, of its importance ; involving, as it does, the rights of property of the citizen on the one side, and the reserved rights of the State and the people on the other. Besides, the power of passing upon the unconstitutionality of a State law, or the acts of the Inferior Court, done and performed in pursuance of a legislative Statute, is necessarily one of great delicacy.

If the question submitted was one of first impression, we might regret that we had not more time to bestow upon its consideration. But the point has been directly made before, and solemnly discussed, and we have been called on to determine,

whether the grant of a franchise with no express clause of exclusive rights or privileges, prevents by necessary implication, the establishment of a rival charter, which may impair its profits or take away its customers. (*Samuel Harrison, administrator, and another, vs. Edward B. Young and another. Ante,* 9 *Geo. Rep.* 359.) It is true that the judgment there was rendered on other grounds. The Court, nevertheless, intimated its opinion very unequivocally against the proposition; and for myself, I must say, that I entertain no reasonable doubt, as to the way in which this principle ought to be settled, especially in Georgia.

[1.] It is contended in behalf of the plaintiffs in error, who claim a ferry right by prescription, over the waters of the Etowah and Oostanaula rivers at their junction, at the City of Rome, that by the Common Law that has been adopted in this State, their franchise, although not declared so, is necessarily exclusive; and that the Legislature cannot, either directly or indirectly, interfere with it, so as to destroy or materially impair its value; that any such invasion is a nuisance, and the party aggrieved has his remedy at law, by an action on the case for a disturbance; or according to the more modern practice, he may resort to Chancery, to stay the injury by injunction.

And such, we concede, was the ancient doctrine in England. And the same principle applied to fairs and markets, if not to *mills* also. *Hardres' Rep.* 163. *Rolle's Abr.* 140. 6 *Modern Rep.* 229. 2 *Ventries,* 344. *Hargrove's Tracts,* 59. *Com. Dig. Patent F.* 4, 5, 6, 7. *Jacobs L. Dict.* 40. 4 *Term. Rep.* 666. *Bull N. P.* 76. *Willes Rep.* 512, *note.* 3 *Black. Com.* 219.

The reason assigned by Mr. Blackstone is, that " where there is a ferry by prescription, the owner is bound to keep it always in repair and readiness for the ease of the King's subjects, otherwise he may be grievously amerced; it would be, therefore, extremely hard, if a new ferry were suffered to share his profits, *which does not also share his burden.*" Now, upon the familiar maxim, that reason is the soul of the law, and when the reason of any particular law ceases, so does the law itself, (7 *Reports,* 69,) the rule relied on by the plaintiffs in error, never should have obtained in this State, where these franchises are regulated by

law, and similar burdens imposed upon all, for the proper discharge of their duty to the public.

But we admit that the law was formerly otherwise in Britain, and that in some of the earlier cases in this country, the Courts held that these franchises, whether expressed or implied, are so to be construed as to exclude all contiguous competition. *Ogden vs. Gibbons.* 4 *Johns. Ch. Rep.* 150. *Newburgh Turnpike Company vs. Miller.* 5 *Johns. Ch. Cases,* 101. *Livingston vs. Van Ingen,* 9 *Johns. Rep.* 507. *Stark vs. McGowen,* 1 *Nott & McCord's Rep.* 387.

[3.] But such is no longer the doctrine in this country. And notwithstanding the profound regrets expressed by Chancellor *Kent* at its overthrow, I must be permitted to say, that such a doctrine, in my opinion, is at war with the universally recognized principles of American constitutional law, and totally inapplicable to our local situation and change of circumstances. For if there be one principle settled in this country beyond the hazard of a change, it is, that in grants by the public, nothing passes by implication. *See United States vs. Arredando,* (6 *Peters,* 736,) where all the cases on this subject are collected together by the learned Judge, (Mr. Justice *Baldwin,*) who delivered the opinion of the Court. The same rule is clearly and plainly stated in *Jackson vs. Lampshire,* 3 *Peters,* 289. *Beatty vs. the Lessee of Knowles,* 4 *Peters,* 108. *Providence Bank vs. Billings & Pitman.* 4 *Peters,* 514.

Adopt this rule of construction and apply it fairly to the case at bar, and the controversy is at an end. For it is not pretended that there is any express grant for the exclusive privilege, which is here set up.

But this question came directly before the Supreme Court of the United States, in the case of the *Charles River Bridge vs. The Warren Bridge et al.* in 1837. 11 *Peters,* 420. The Legislature of Massachusetts incorporated a company, to make a bridge over Charles river, giving the company the right to take toll for a certain number of years. The grant contained no exclusive privilege over the waters of the river, above or below the bridge ; and the question presented to the Court was, wheth-

er by a subsequent act of incorporation, the State Legislature could constitutionally confer on a *junior* company, the right of constructing a rival bridge which would interfere with the income of the *elder* existing corporation, which it had previously chartered.

On that question, the Court held the affirmative ; and that the construction of the *Warren Bridge* was no violation of the franchise of the *Charles river Company* ; and that as to the loss of tolls with which it was threatened, that was a consequential change, resulting from a lawful act—*damnum absque injuria*, for which the elder company had no redress.

Chief Justice *Taney*, in delivering the opinion of the Court, said : " The object and end of all government, is to promote the happiness and prosperity of the community, by which it is established ; and it can never be assumed, that the government intended to diminish its power of accomplishing the end for which it was created. And in a country like ours, free active and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade, and are essential to the comfort, convenience and prosperity of the people. A State ought never to be presumed to surrender their power, because, like the taxing power, the whole community have an interest in preserving it undiminished. And when a corporation alleges that a State has surrendered for seventy years, its power of improvement and public accommodation, in a great and important line of travel, along which, a vast number of its citizens must daily pass—the community have a right to insist, in the language of this Court above quoted—" that its abandonment ought not to be presumed in a case, in which the deliberate purpose of the State to abandon it, does not appear." The continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation, and the functions it was designed to perform, transferred to the hands of privileged corporations. While the rights of private property are sacredly granted, we must not forget that the community, also, have rights ; and that the happi-

ness and well-being of every citizen depends on their faithful preservation."

This decision, based as it is, upon a subject particularly within the cognizance and jurisdiction of the Supreme Court of the United States, is entitled to the highest deference. Indeed, we apprehend, that all the State tribunals will feel bound to follow it in a like case, until it is overruled.

I may be allowed to add, that the proposition which it establishes, commands my entire assent and approbation, namely: That the grant of a public road, bridge, or ferry, confers the right to construct the improvements only, and to receive certain rates of tolls; but does not carry with it exclusive privileges, where none such are expressly given; and that by grants of this description, the Legislature or the Inferior Court, acting by their authority, are not deprived of the power of making other grants side by side with the former, and in the same line of travel, provided there be no express violation in the first grant.

[4.] But apart from the adjudication and the legal logic by which it is sustained, the history of the legislation in this State shows, that it has been the uniform understanding of our people, that if the grantee intended to secure himself from competition, he must obtain a provision to that effect in his grant; and if no such provision is found, it is to be inferred, that the grant was taken with a reliance on the wisdom and discretion of the Legislature or its agents, to protect the grantee from injurious competition, by refusing to authorize any other enterprise of a similar character in the immediate vicinity, unless demanded by the exigencies of trade and travel. Every principle of sound policy forbids that existing rights should be capriciously or wantonly disturbed. We are not to presume or anticipate, that this will be done. After all, it is better that individuals should be at the mercy of the public, than that the public should be dependent on individuals.

Regretting, as I have had occasion to do before, the want of an authentic Digest of our Colonial Statutes ; one of the earliest charters I find granted by the Legislature, was to secure to Joseph Bryan, the exclusive right and privilege of erecting a toll-

bridge across the Great Ogechee river, in which it was enacted among other things, that "it shall not be lawful for any person or persons whatever, to erect any other bridge on the same river within three miles up or down from the place designated." *Marbury and Crawford's Digest,* p. 47.

[5.] And from this period down to the present time, it never was dreamed, that the mere establishment of one right was in itself, a negative on the power to establish others and hence, express provisions are always introduced, for the purpose of tying up the hands of the Legislature, or its agent, the Inferior Courts of the County, from the exercise of this acknowledged right. *Clayton's Compilation,* 184. *Lamar's Digest,* 116, 119. *Dawson's Compilation,* 397. *Prince's Digest,* 302, 304, 920, 325, 343, *et passim.*

And the last Legislature has manifested its repugnance to these monopolies, in the most decisive manner, by authorizing all persons whatever, to establish ferries and erect bridges across water-courses or streams on their own land, upon certain conditions. *Pamphlet Acts,* 174. And this is right. In England and other countries, which are governed by force, the performance of public duties by inn-keepers, owners of bridges and ferries, &c. can be coerced by the enforcement of legal penalties. Not so here; we have, and in the very nature of things can have, no other protection, but that which results from free and unrestricted competition.

If, then, it be true that the history and situation of a State may be resorted to, in order to expound its legislative intentions, as was said in *Preston vs. Bowden,* (1 *Wheaton,* 115,) and that charters are to be expounded, as the law was understood when the charters were granted. (2 *Inst.* 282,) it was never the intention of the Legislature, in permitting this ferry to be set up, to bind itself that another bridge or ferry should not be established.

Our conclusion then is, that neither the terms of the grant, nor the great current of public opinion, give any countenance to the claims set up by the plaintiffs in error, founded on their ferry, for an exclusive franchise extending up and down the two rivers at their junction.

For fifty years, we have heard of no instance in which such an implied right has been contended for. Neither individuals nor corporations ever imagined, for a moment, that they were entitled to such lateral and latitudinous privileges. Such an interpretation of legislative grants, would strike with astonishment, those who have conferred them. It would be to array fiction against fact.

Establish the doctrine, that a mere charter to build a bridge or road, or run a ferry, where no exclusive privilege is given ; no undertaking on the part of the State, that no rival work shall be erected, entitles the grantee to infer, that all competition which would diminish the amount of its income, is excluded by the very nature of the contract ; and we shall sow broad-cast over this land the seeds destined to yield in due season, the most abundant crop of litigation, ever garnered in this or any other country.  Railroads have been built in every direction throughout the State, regardless of the broad privilege now claimed.  How many ferries and bridges created by law have been ruined by the introduction of these newer and better modes of travel and transportation ?  Yet has Mr. Parks on the Oconee, Dr. Wiley, the owner of the Tobesofkee Causeway, a most expensive work, and a hundred other properties of public improvements along these different lines, ever supposed that their rights were invaded, or any contract violated on the part of the State, by the construction of the Georgia and Southwestern railways, and the numerous other routes that web the State ?

It is urged, that these works have been built at a heavy cost, and good faith requires that nothing should be done, which, by curtailing their profits, would lessen or destroy their value. What reason is there, I would ask, for holding a franchise more sacred than the land to which it is annexed? Or why should the rights of a company be more carefully protected than those of an individual ?

This ferry, when it was established, was suited to the then wants of the country, and owing to the increase of population and the trade to Rome, their income will be, in all probability, greatly enhanced, in despite of all the competition which may be

set up.   But suppose it were otherwise ; are these ferry owners
to be exempted from the casualties to which all other citizens are
liable ?   As well seek to insure them against flood and fire, as
the fluctuations in public policy.   Whole towns are frequently
broken up, and all the property in them rendered worthless by
the establishment of a new road, which diverts the business to
some other point.   Petersburg, once a flourishing village on the
Savannah river, is now a cotton-field.   One capitol in this State,
has already been ruined by the removal of the seat of government,.
and the present has been repeatedly menaced of late, with the
same calamity; yet, who doubts the power, whatever we may
think of the wisdom of these changes ?   While we reprobate
that fickleness, which, without any adequate public considera-
tion, would sport with the prosperity and happiness of a whole
community, still, it must be conceded, that in the march of em-
pire and civilization, these vicissitudes are inevitable.   To-day,
wealth and splendor—to-morrow, dilapidation and ruin.   Such
is human life—such the past record of our race, individually and
collectively.

If the facts charged in the bill be true, will not the owners of
real estate, city lots on the streets leading to the old bridge, be
equal sufferers, if the present trade and travel be discontinued ?
And why are these taverners and shop-keepers not entitled to in-
demnity ?

[6.] It is true, that charters may be granted with peculiar priv-
ileges, and such grants are often deemed necessary to the
promotion of public enterprises, which might not otherwise have
been undertaken, and which might have been delayed to a much
later period.   But whenever, owing to a change in the popula-
tion, business, and intercourse of the country, the public inter-
est requires the opening of new avenues, *within the limits even of
such exclusive grants*, even *chartered* rights, as well as individual,
must yield and become subservient to the public good, *provided,
just compensation be made.*

It is further argued, that the power to take by eminent domain,
cannot be transferred to any subordinate agent, but must be ex-

ercised by the State itself.     That each individual exercise of the power must be by a legislative act.

I find, upon examination, that this identical objection was raised in *Backus vs. Lebanon*, 11 *New Hampshire*, *Rep.* 19; and it is thus met and disposed of by Ch. J. Parker :    " No authority is cited in support of this proposition, and it is certainly in conflict with the practice of this government from its first institution, and it is believed with that of all others of the United States.     It would require very strong reasons to authorize us to break in and condemn this continued practice of two centuries; but none have been suggested, and none present themselves to us.     If the power of eminent domain is exercised, through the action of general laws and judicial tribunals, there is probably quite as little danger to be apprehended from its abuse, as in any other mode which can be devised."

A provision authorizing the Inferior Court to exercise a jurisdiction for this purpose, was enacted more than a half century since, and has been acted upon and tried without any question respecting its constitutionality, up to the present time, and with the learned Judge above, we can only say, that no sufficient reasons present themselves to us, for negativing this power.

But the plaintiffs claim protection, under the contract entered into with the Inferior Court of Floyd County.     What was that agreement ?     That in consideration of the removal of the County site, from Livingston to Rome, and its permanent location at the latter place, they would do certain things ; and among the rest, transport free of toll, the citizens of Floyd County, on foot and on horseback, except such as were going to, and returning from, their plantations.     It is admitted that the County site was transferred, and yet this was the only undertaking on the part of the Court.     The obligation to transport free of toll, a certain class of the inhabitants, was a burden imposed upon the owners of the ferry, instead of a benefit accruing to them ; and it occurs to us as rather singular, that an arrangement to relieve them of this onerous engagement, should be exhibited as a grievance, for which the plaintiffs are entitled to redress.     There is, in our opinion, no merit in this view of the case.

The only other ground upon which the plaintiffs seek relief, is the purpose avowed by the Court, of opening new roads which will divert the line of travel from their bridge.   If we are right in the main proposition, then it follows of course, that the plaintiffs have no exclusive property in the public travel.   No one is bound to pay toll at their crossing place ; neither is it the duty of the Court to compel them to do so, by hedging them in to this particular route.   On the contrary, the Court would be faithless public servants, if they neglected and refused to open up as many highways as the public necessities demanded, and leave it optional with all to pass where they are best accommodated.

It will be perceived that in this discussion, we have placed the case on the most favorable footing for the plaintiffs.   We have not questioned the validity of their prescription although its origin is distinctly disclosed in the bill, to have been in 1831. We have treated it as a grant from the State ; our only inquiry upon this head, has been, whether a ferry has, as appurtenant to it, a franchise which excludes injurious competition from the waters above and below.   And our conclusion is, that such a grant indicates no such privileges up or down stream—establishes no such undefined, unmeasured, and ever varying rights.

[7.] Again, we have treated the right of pontage, which has been substituted for that of the *ferry,* as though it stood on the same foundation, whereas it is quite apparent, that according to the averments in the bill, the plaintiffs show no prescriptive right to their *bridge.*   Was it built in the same place where the old ferry was kept ?   If so, then has not the ferry ceased of necessity to exist, as soon as the bridge was erected ?   And if the rights which were incident to it, could not be transferred to the bridge, what have become of them ?   Are they not extinguished ?

But all these minor matters have been waived in order to ascertain and determine, whether the plaintiffs can sustain the exclusive rights and privileges which they claim.   And the present investigation has only served to strengthen the conviction, which we previously entertained, that they cannot.   And we feel fully warranted in saying, that this doctrine of an implied grant,

would not be sanctioned at this day and in an English Court. 2 *Barn. and Adol.* 793.

Were there any imperative rule of law, binding me to a contrary judgment, I would bow to it; for in the language of another, I feel already the responsibility sufficiently great, of *expounding* laws, without increasing it by *making* them. But while we have adopted the English system of jurisprudence, civil and criminal, it is left to the Courts to determine, whether there be anything in our local situation, or in the nature of our political institutions, which would render any portion of it inapplicable; and would it not be strange for the Courts of this country at this day, to enforce a doctrine which had its origin in the feudal system; a system, justly characterized, as aggregating to itself all privileges, which increased the mass of wealth in the feudal Lords, at the expense of the public? Whoever thinks of applying this notion of special privilege, to mills and markets? And if the doctrine has been abandoned as to these, why insist on constructive franchises in ferries?