STATE HIGHWAY BOARD *v.* WILLCOX *et al.* (two cases).

884

Nos. 6767, 6789.   JULY·25, 1929.   REHEARING DENIED AUGUST 7, 1929.

*W. S. Mann, J. P. Highsmith, S. M. Smith,* and *J. C. Bennett,* for plaintiff.

*Hal Lawson, Gordon Knox,* and *L. C. Harrell,* for defendants.

HINES, J.   These cases are in this court upon writs of certiorari to review the decision of the Court of Appeals in *Willcox* v. *State Highway Board,* 38 *Ga. App.* 373 (144 S. E. 214).   The State Highway Board instituted proceedings in the superior courts

of Telfair and Jeff Davis Counties for the condemnation of certain lands for a right of way for a State-aid road, for a bridge-site across the Ocmulgee River, including its abutments and approaches (said bridge forming a link in said road), and for material used in the construction and building of said road. The particular lands sought to be condemned are portions of two tracts which lie on both sides of said river and are jointly owned by J. Clyde Willcox and I. L. Cook. These owners operated a public ferry over the river, the landings of which were on the tracts of land owned by them. In December, 1917, Willcox obtained from the commissioners of Telfair County a license to operate this ferry, and transferred a half interest therein to Cook. They began to operate this ferry in May, 1918. Hilton owned and operated a ferry over this river about 100 yards from the ferry operated by Willcox and Cook. The operation of the two ferries was unprofitable, and Willcox and Cook bought out Hilton, paying him $2,500 for his ferry. The Hilton ferry was discontinued. The road in question is the State highway running through McRae and Lumber City and crossing the river to Hazlehurst, and has been a State highway since January 1, 1922. On October 12, 1923, it was designated by the State Highway Board as a Federal-aid national highway. It begins at the Georgia-North Carolina line en tour from Murphy, North Carolina, and runs through Blairsville, Gainesville, Athens, Madison, Gray, Macon, Perry, Hawkinsville, Eastman, McRae, Lumber City, Hazlehurst, Alma, Waycross, Folkston, on to the Florida line.

After Willcox and Cook bought out Hilton, their ferry began to make money; and thereafter it proved very profitable. Between 1922 and the cessation of its operation, the ferry produced a gross income of $40,000. In 1925 the gross income was $14,119.76, and the net income was $12,384.38. The gross income from January 1, to April 22, 1926, was $3,064.60. The bridge was opened to the public on the latter date, and the ferry was then abandoned. The ferry-site is located some distance from the right of way and the bridge-site sought to be condemned. The State was not seeking to condemn and take any portions of these lands used as a ferry-site; and the lands sought to be condemned and taken as a right of way for the highway and for the bridge-site do not in any way interfere with the physical operation of the public ferry of

these landowners. In its decision the Court of Appeals in effect holds that these owners are entitled to be compensated for the damages sustained by them arising from the loss of profits due to the erection of this public bridge across this stream, and its free use by the public. It is this ruling and certain conclusions which led up to it which we are to review in this case. The far-reaching consequences of the decision by the Court of Appeals make it necessary to give careful and serious consideration to this matter.

■ It becomes necessary, first, to determine whether individuals who own lands on both sides of a stream have the right, as one appurtenant to the lands so owned by them, to operate a public ferry, without a license or franchise from the State or its constituted authorities, authorizing them so to do. It is urged that such owners have the right to operate a public ferry regardless of whether they have a license from the State to do so or not, and that they have this right under the act of 1850, which is now embodied in section 761 of the Civil Code. In other words, counsel for the landowners contend that this act grants such privilege. The code section is as follows: "Any person who may be the owner of any land through which a stream may pass, on both sides thereof, may establish any bridge or ferry thereon, at his expense, and may charge lawful toll for crossing, according to the rates of other bridges and ferries on the same stream, or, if none other, the customary rates over such streams elsewhere." Section 3639 of the Civil Code is as follows: "The right to construct a bridge or establish a ferry for private use, across a watercourse within or adjoining lands, is appurtenant to the ownership of the land; but the right to establish and keep a public bridge or ferry is a franchise to be granted by the State. Where such a grant interferes with the owner's right of exclusive possession, just compensation to him must be first made." In *Greer* v. *Haugabook,* 47 *Ga.* 282, this court held that section 761 of the Civil Code is to be construed in harmony with section 3639; and so construing them, this court held that the owner of lands on both sides of a stream could not establish and operate a public ferry over the stream without a grant from the State. In *Whelchel* v. *State ex rel. Wiley,* 76 *Ga.* 644, this court held that the act of 1850 "merely grants the privilege to an owner of land on both sides of a stream to pass from one side to the other by a private bridge or ferry, and as an incident thereto to pass

others upon the payment of toll." This construction of the two sections was again followed in *Hudspeth* v. *Hall,* 111 *Ga.* 510 (36 S. E. 770), in which this court held that "The right to establish and maintain a public ferry is a franchise, which, in this State, can only be granted by the proper county authorities." Also: "To lawfully establish and maintain a private ferry, no franchise is required. Such a right is incident to the ownership of land on both sides of a stream of water, to enable the owner to better use and enjoy his land. While the owner of a private ferry may lawfully charge and collect toll from persons incidentally crossing thereat, he can not maintain the ferry for use by the public at large." This distinction was recognized in *Futch* v. *Bohannon,* 134 *Ga.* 313 (67 S. E. 814, 30 L. R. A. (N. S.) 462, 19 Ann. Cas. 982).

But counsel for the condemnees rely upon the decision in *Averett* v. *Brady,* 20 *Ga.* 523, as holding the contrary. The action in that case was ejectment for the recovery of land and mesne profits. Among the mesne profits claimed by the plaintiff was the income from the operation by the defendant of a ferry on the premises. The defendant insisted that the right to operate a ferry was a franchise belonging to the State, and that no one could rightfully exercise the same without a legislative grant; and that for this reason no rents were due the plaintiff for the use of that which did not belong to him as a riparian proprietor. This court, in the opinion in that case, said: "A ferry may be granted to a corporation as well as to a natural person; and in England it has been held that an information in the nature of a quo warranto lies against them, if they set up an exclusive ferry without title, but it does not lie for merely taking money of passengers. (Grant on Corp. 195 (186)). This last decision would seem to recognize the right of the owner of land through which a stream passes to establish a ferry and charge tolls without the grant of such authority from the sovereign power. The act of our own General Assembly of 1850 gave this right." The court was not dealing with the question whether a public ferry could be operated without a franchise from the State. On the contrary it is stated that the defendant was presumed to have had a franchise to operate the ferry. It simply held that the plaintiff as the owner of the land on both sides of the stream could operate a ferry and charge passengers, and that

profits received by the defendant from such use of the plaintiff's land could be recovered by the plaintiff under the act of 1850, although he had no franchise to operate a ferry.

So the right of the condemnees to operate this public ferry is not one appurtenant to their ownership of the land on both sides of the river. The right to operate this public ferry is derivable solely from the franchise granted to Willcox in December, 1917. The measure of damages to which the condemnees are entitled for the land taken by the Highway Board for the erection of this public bridge must be determined in view of this fact. The measure of such damages can not be fixed upon the theory that their right to operate this ferry is one appurtenant to the ownership of the land on both sides of the stream, and that this right has been impaired by the erection of this public bridge.

So the question is narrowed down to this: If a franchise is granted to the owners of land on both sides of a navigable stream to operate a public ferry over such stream, which they esstablish and operate under such franchise, and the State thereafter seeks to condemn for a public bridge land of the owners, not being the landings of or approaches to the ferry, but constituting a portion of a larger tract owned by them over another portion of which the ferry is operated, are such owners entitled to compensation from the State for loss of the profits from their ferry, due to the erection of a public bridge over which travelers can travel free? In other words, are such owners entitled to be paid the value of the land so taken, based in part upon profits which they received from the use of the ferry before the bridge was built by the State? The owners of this land have no exclusive right to operate their ferry over this stream. "No franchise granted by this State shall be held to be exclusive, unless plainly and expressly so declared to be in the grant." Civil Code (1910), § 3640. It is not pretended that the franchise granted to them to operate this ferry plainly and distinctly declares that it should be an exclusive one. There is nothing in the grant to show that it was intended to be an exclusive one. The ancient doctrine of the common law that the franchise of ferry, although not declared to be exclusive, is necessarily implied in the grant, is inapplicable to the local situation and political institutions of this country. *Shorter* v. *Smith,* 9 *Ga.* 517. "A grant to establish and operate a public ferry does

not carry with it any exclusive right." *Hudspeth* v. *Hall,* supra. Ferries over watercourses making county lines may be licensed by either county. Civil Code (1910), § 757. Such license can not be granted for a period exceeding ten years, but may be renewed at the expiration thereof. Civil Code (1910), § 747, par. 3. The license in this case was granted to Willcox for the period of ten years. So the franchise to operate this ferry was not exclusive. Further, if there had been an attempt to grant an exclusive franchise, which would abridge the right of eminent domain possessed by the State, the grant would have been void. In paragraph 2 of section 1 of article 4 of the constitution of this State it is declared that "The exercise of the right of eminent domain shall never be abridged." Civil Code (1910), § 6464. Again, the constitution declares that no law "making irrevocable grants of special privileges shall be passed." § 6389. Clearly, then, the condemnees had no exclusive right or franchise to operate this ferry.

Not having an exclusive franchise, are the owners of this ferry entitled to compensation for loss of profits due to the erection of this free bridge by the State? The State has the right to erect bridges over its streams whenever and wherever the legislature may deem them necessary for the convenience of the public; and the right of eminent domain, by which the State is authorized to take private property for public use when the necessities of the country require it, is an inherent right of this State. The right to receive toll for the transportation of travelers and property over ferries operated over navigable rivers was, at the common law, a franchise of the crown. In this State it belongs to the people collectively. *Young* v. *Harrison,* 6 *Ga.* 130. In arriving at the value of the land taken by the State in this case for a public bridge, the element of value arising from the grant and operation of a franchise to the owners to operate a ferry is not to be taken into account. Where the grant is not by its terms exclusive, the legislature is not precluded from granting a similar franchise or from authorizing the construction of a rival way, which may greatly impair or even totally destroy the value of the former grant. So the State is not precluded, by granting a franchise of ferry, from constructing a rival highway and bridge which will greatly impair or even totally destroy the value of the ferry franchise. In *Shorter* v. *Smith,* supra, this court said: "The legislature or the inferior court

[now the ordinary] as its agent, after having chartered a company to make a particular improvement for public accommodation, without any provision that no rival improvement should afterwards be authorized, may grant a charter to another company or individual, to make an improvement of the same or of a different kind, to afford the like accommodation, however the work of the junior company might impair, or even destroy the profits of the elder." In *Hudspeth* v. *Hall,* supra, this court again announced the same principle, as follows: "The right to establish and maintain a public ferry is a franchise, which, in this State, can only be granted by the proper county authorities. Such a grant carries with it no exclusive privileges, but such authorities may, under the laws of this State, grant the right to establish over the same stream such additional public ferries as the public convenience demands; and if the first grantee is injured by the establishment and maintenance of another public ferry, he has no right of action to recover damages therefor; it is damnum absque injuria." These decisions are in harmony with the great majority of the outside authorities, and are in accord with sound reasoning.

The construction of such rival way and bridge is not such a taking of the land or franchise of the owners of the ferry as will entitle them to compensation. 20 C. J. 704 (§ 159) b. "It is competent for the legislature, after granting a franchise to one person, which affects the rights of the public, to grant a similar franchise to another person, the use of which shall impair, or even destroy, the value of the first franchise, although the right so to do may not be reserved in the first grant." Ft. Plain Bridge Co. *v.* Smith, 30 N. Y. 44. A grant of a ferry franchise to meet the public convenience is not an exclusive grant that will, on account of the prohibition against impairing the obligations of contracts, preclude the legislature from granting a bridge franchise detracting from its value; and where a franchise has been granted solely for public convenience, there can be no damage for its depreciating in value from the subsequent grant of a similar franchise. Dyer *v.* Bridge Co., 2 Porter (Ala.), 296 (27 Am. D. 655). In the absence of express provision in the charter of a turnpike and ferry company that no competing turnpike, ferry, or bridge shall be erected near by, a grant to a county of the right to construct a rival bridge and turnpike does not impair the obligation of a contract, though it

totally destroys the value of the former grant. Such grant is not a taking of the former franchise which entitles the owner to compensation for the resulting damage; and the depreciation of the profits of the former company can not be considered in determining the damage occasioned by an appropriation of a part of such company's property. Hydes Ferry Turnpike Co. v. Davidson County, 91 Tenn. 291 (18 S. W. 626). The laying out of a new road, under authority of the legislature, which materially diverts the travel from the former one, under a prior charter granting the right to take tolls, not exclusive in its terms, is not an unconstitutional act. Salem &c. Turnpike Co. v. Town of Lyne, 18 Conn. 451.

When the State grants a franchise that is not in its terms exclusive, it may subsequently grant a competing franchise that may utterly destroy the value of the first franchise, without incurring any obligation to make compensation. Where the holder of a franchise has no contract with the State that he shall have a monopoly, the exclusive privilege which he has been fortunate enough to enjoy before a rival is chartered is not property in the constitutional sense; and the owner is not entitled to compensation when such privilege is taken away. 10 R. C. L. 76, § 67; Charles River Bridge v. Warren Bridge, 11 Peters, 420 (9 L. ed. 773); LaFayette Plank Road Co. v. New Albany &c. R. Co., 13 Ind. 90 (74 Am. D. 246); Clarksville &c. Turnpike Co. v. Montgomery County, 100 Tenn. 417 (45 S. W. 345, 58 L. R. A. 155); Tuckahoe Canal Co. v. Tuckahoe Railroad Co., 11 Leigh (Va.), 42 (36 Am. D. 374). "In proceedings to condemn land for highway purposes, the fact that the opening of the new highway across a creek will divert travel from the ferry of a landowner, the landing of which is located on ground not taken, does not entitle the landowner to consequential damages based on such injury." Board of Supervisors v. Hasbrouck, 215 App. Div. 147 (213 N. Y. Supp. 337). "Loss arising from the competition of the condemning party does not constitute an element of damage, and the same is true of loss arising from increased competition on the part of others growing out of the use to which the condemned land is to be put." 20 C. J. 781 (§ 234) c. "In proceedings to condemn land, loss arising from the competition of the condemning party by means of the land taken is not an element of the compensation to which the landowner is entitled." Philadelphia &c. Ferry Co. v. Inter-

City Link R. Co., 76 N. J. L. 50 (68 Atl. 1093). "Where a small part of a strip of land along a river bank used as a ferry and wharf landing is condemned for the purpose of erecting thereon the pier of a county bridge across the river, the owner of the land is entitled to be paid the value of the land taken, and the damages for the injury to the adjoining land as a wharf landing, but not to the loss by the depreciation of the profits of the ferry franchise by the opening of the bridge; the franchise itself and its exercise not being impaired by the existence of the pier." Moses v. Sanford, 79 Tenn. 731. "Where the construction of a bridge will interpose no physical obstruction to the enjoyment of a ferry franchise across the same river, the owners of the ferry are not entitled to compensation for any incidental impairment of the profits of their ferry, resulting merely from the use of the bridge instead of the ferry by the public." Piatt &c. v. Covington &c. Bridge Co., 71 Ky. 31.

In Richmond &c. Turnpike Road Co. v. Rogers, 62 Ky. 135, it was held: "1. In condemning land for a bridge across the Kentucky river, the jury can not allow to the proprietor of the land damages for any injury resulting to his ferry from the construction of the bridge. 2. In such cases the proprietor is entitled to the value of the land actually taken, and compensation for any incidental or collateral damage which the taking of it will produce to his other land." In White River Turnpike Co. v. Vermont Central R. Co., 21 Vt. 590, it was said: "It is also settled that where there has been a legislative grant to a private corporation to erect a bridge, turnpike, or other public convenience, which is not in its terms exclusive, there is no constitutional obligation on the legislature not to grant to a second corporation the right to erect another bridge or turnpike for a similar purpose, to be constructed so near the former as greatly to impair, or even to destroy, the value of the former,—and this without making compensation to the first corporation for the consequential injury." "The grant to a corporation of the right to erect a toll-bridge across a river, without any restriction as to the right of the legislature to grant a similar privilege to others, does not deprive a future legislature of the power to authorize the erection of another toll-bridge across the same river so near to the first as to divert a part of the travel which would have crossed the river on the first bridge if the last

had not been erected." Mohawk Bridge Co. *v.* Utica &c. R. Co., 6 Paige (N. Y.), 554. The people of this State, as we have seen, possess the right and power to erect bridges and operate ferries over the navigable rivers of this State. They can grant franchises to individuals or corporations to build toll-bridges over such streams, or to operate ferries over the same for toll. The grant of a franchise to do either is not exclusive, unless clearly so expressed. The grant of a franchise for either of these purposes, which is not exclusive, does not prevent the legislature from granting another franchise for either of said purposes. The legislature can condemn land for either of said purposes; and if the taking of land for either of said purposes does not prevent the exercise of the prior franchise, the same is not such taking of the property of the holder of the prior franchise as will entitle him to compensation.

■ But it is insisted that this holding is in conflict with certain provisions of the Code and certain decisions of this court. In the first place it is urged that this holding conflicts with section 688, which is as follows: "In estimating the value of land when taken for public uses, it is not restricted to its agricultural or productive qualities, but inquiry may be made as to all other legitimate purposes to which the property could be appropriated." The Code section does not sustain the contention. It means that, in estimating the value of land taken for this right of way and bridge-site, the jury should not be restricted to its agricultural or productive qualities; but the value of this land for all purposes should be considered. It does not mean that in estimating the value of the land so taken the jury could take into consideration the losses arising from the operation of a ferry of the owners, due to competition springing from the use of this bridge by the traveling public. It is further insisted that this holding conflicts with section 781, which is as follows: "In determining the value of land taken for a bridge, its prospective value as a bridge-site, and its present value as a ferry, if one is in use, may be taken into calculation." This principle is not applicable to the question which we are considering. The State is seeking to take land for a right of way and for a bridge, and its prospective value as a bridge-site and its present value as a ferry, if one was in use, should be taken into calculation. This does not mean that the value of another ferry-site and profits arising from the operation of such ferry

should be taken into consideration in determining the value of the bridge-site which the State is seeking to condemn.

Again, it is urged that the contrary is held in *Dougherty County* v. *Tift*, 75 *Ga.* 815. In the first place, the opinion in that case was not by a full bench, which then consisted of three Justices. One of them was disqualified. Chief Justice Jackson concurred specially, and stated that he "could not concur in all the reasoning of Justice Blanford," who wrote the opinion of the court. If we can consider the proposition laid down in the second headnote of this case as that of the two Justices who presided, and not the individual opinion of the Justice who wrote the opinion, the opinion in that case is not binding as a precedent for any proposition therein laid down. Furthermore, the opinion in that case is not authority for the proposition that where land is taken for a public highway and bridge over a stream, the owners are entitled to have the diminution or destruction of the profits of their ferry, due to the erection of the bridge, considered in determining the value of the property taken by the State for its highway and bridge, when the franchise of the owners to operate the ferry is not exclusive. Again counsel for the landowners rely upon the decision in *Mitchell County* v. *Hudspeth*, 151 *Ga.* 767 (supra), for the proposition that the compensation claimed by the landowners should be allowed. The decision in that case does not support the proposition for which counsel for the condemnees contend. When properly construed, that decision is not in conflict with what we hold; but if we held otherwise, that would make it in conflict with the former decisions of this court. It is to be noted that the court in rendering the decisions in *Dougherty County* v. *Tift* and *Mitchell County* v. *Hudspeth* made no reference to the decision in *Shorter* v. *Smith*.

■ The Court of Appeals held that the damages awarded by the jury were so small as to justify the inference of gross mistake or undue bias; and for this reason that court set aside the verdict. This conclusion was based upon the ground that the verdict in each case "shows on its face that the value of the land for ferry purposes and its value as a bridge-site were not taken into consideration by the jury." In this we think that court was in error, in view of the ruling made above, that the landowners were not entitled to compensation for loss of profits from their ferry arising from the construction of this public bridge. If the jury could

have legally allowed such compensation, then the criticism on the amount of the verdict in each case would be justified. If such compensation was not recoverable, then the verdict in each case was supported by the evidence. The verdict can not be held to be too small, under the evidence, unless the owners of the ferry were entitled to compensation for the loss of profits arising from the erection of this free bridge. There was evidence that the value of the land for all purposes would not exceed $35 per acre. This estimate was not based solely upon the value of the land for agricultural purposes, but for all purposes for which it could be used. So the verdicts should not be set aside because they were so small that they indicated mistake or undue bias on the part of the jury rendering them.

■ If the proposition announced by the Court of Appeals in the headnote to its decision is to be construed to mean that compensation should be allowed the owners of this ferry for loss of profits arising from its operation due to the erection of this public bridge, then such ruling is erroneous in view of the rulings made in the second division of this opinion.

■ The ruling made in headnote 6 does not require any elaboration.

*Judgment reversed. All the Justices concur, except Russell, C. J., and Hill, J., who dissent.*

HILL, J. I dissent from the judgment of the majority in this case, reversing the judgment of the Court of Appeals. This was a condemnation proceeding, brought by the State Highway Board of Georgia under the Civil Code (1910), § 5206, against J. Clyde Willcox and I. L. Cook, for "the condemnation of certain lands for a right of way for a State-aid road, and for material to be used in constructing and building the road." The principal object of the condemnation proceedings was to secure a bridge-site across the Ocmulgee river, with abutments therefor and approaches thereto on the land of the defendants. The parties to the condemnation proceedings agreed to, and did, submit to the jury, as the *sole issue* to be tried, the value of the land sought to be condemned. The evidence before the jury tended to show that on the lands sought to be condemned the defendants had a legal franchise to operate, and did operate, a public ferry across the Ocmulgee river, a navigable stream; that they charged toll to the public for

crossing the river on their ferry; that they kept in repair the road and approaches to the ferry on both sides of the river; that the chief value of the land to them was the revenue derived from the tolls from the ferry, and the land sought to be condemned for a bridge-site was peculiarly adapted to such purpose; that the defendants continued to operate their ferry until the completion of the bridge by the State Highway Department, etc. See 38 *Ga. App.* 373, where a fuller statement of the case may be found. It is there stated that "there was evidence that the value of the land for ferry purposes was destroyed by the construction of the free bridge by the highway board." The evidence as to the value of the land per acre without regard to the ferry, ferry rights, income derived from the ferry, or the land's particular availability as a bridge-site, etc., and the cost of the bridge, varied from $30,000 to $100,000. The evidence as to the value of the land by the acre for agricultural purposes, without regard to the above features, varied from $20 to $35 per acre. The jury rendered a verdict for $300 for the land in Jeff Davis County, and $162.50 for the land in Telfair County." The Court of Appeals reversed a judgment overruling a motion for a new trial, and held that "where, upon condemnation proceedings, the State Highway Board appropriates land for bridge purposes, and by agreement the value of the property so appropriated is the only issue to be passed upon by a jury, the whole worth of the land taken, and the purpose for which it is appropriated, as well as its value as a ferry-site (in the case here), should be taken into consideration by the jury in arriving at just and adequate compensation for the land so condemned for a bridge-site." I think the Court of Appeals correctly decided the case. For a clear and illuminating decision on the question involved see the opinion of Judge Luke in the *Willcox* case, supra.

In view of the pleadings and the evidence, the verdict awarding the plaintiffs such a pitifully small amount of damages for the land taken for a bridge-site is sufficient to "shock the moral sense," and I can well see how the Court of Appeals should decide to send the case back for another hearing. Civil Code (1910), § 4399; *Dougherty County* v. *Tift*, 75 *Ga.* 815(3); *Anglin* v. *Columbus*, 128 *Ga.* 469 (57 S. E. 780). The small amount allowed the plaintiffs is a virtual confiscation of plaintiffs' property, and in violation of the due-process clauses of the State and Federal constitutions.

According to the evidence in the record the amount allowed plaintiffs was only about $25 or $35 an acre—no more than the land was worth for agricultural purposes, and allowed nothing for its value for other purposes, such as for bridge and ferry sites, etc. The jury obviously did not consider these in estimating the damages, for they found only the proved value of the land taken for agricultural purposes. The cases cited by the majority as supporting their contentions are not in point. Most if not all the cases are from outside jurisdictions, are cases where there is a competition between *franchises,* and the . granting of *franchises,* where ·one already existed, to operate a ferry or bridge to the injury of the other. There is no such issue made by the pleadings and evidence here. The sole issue (as agreed by all parties) is what is the amount of compensation or damages to be awarded condemnees. There is no question as to the right of the State Highway Department to build a bridge where they have built it, if they condemn the land according to law; but the question is whether they can condemn land for that purpose, without paying *"just and adequate compensation"* therefor. The Court of Appeals was of the opinion that they had not done that, and in that view I concur. The theory of the majority of the court proceeds apparently on the idea that the owners of lands on both sides of a stream could not establish and operate a public ferry over such stream without a grant from the State. In the first place, the State has granted to plaintiffs the right to operate a ferry, with the consequent right to charge tolls to the public therefor; and the State has not withdrawn that right, so far as the record discloses. But that is not the question here. The sole question here is, can the State, which has granted such franchise to owners of land to operate a ferry, or without the grant of such franchise, take land adjacent thereto, for the public purpose of building a bridge thereon, and make it a free of toll bridge to the public, that is, charge no toll to travelers for passing over such bridge, without paying to the owners of the land "just and adequate compensation therefor." Both the State and Federal constitutions declare that that can not be done. The question involved here is not whether plaintiffs can operate a ferry in opposition to the State's operation .of a bridge from collecting tolls, but whether the State can take plaintiffs' land for public purposes without paying for it just and adequate compensation. There

can be no question that the taking of private land for the purpose of erecting a free bridge thereon is for public purposes. There is no contention on the part of the plaintiffs that they have the *exclusive* right to operate their ferry over this stream; and therefore what the majority opinion says on that subject is wide of the mark, and purely obiter dictum. Neither is it contended by plaintiffs that the right of eminent domain shall be abridged, as the majority opinion argues, nor that "irrevocable grants shall be passed." The real and only question in this case is (and that was by agreement of the parties on the trial of the case) what is the amount of compensation or damages to be awarded the condemnees, Cook and Willcox, and whether, in arriving at a correct answer to that question, the element of value of the land for bridge and ferry site can be considered *along with other consideration*. This court decided that such elements can be considered. In *Harrison* v. *Young, 9 Ga.* 359 (4), 364, it was held, in 1851, that "The value of land taken for public use is not restricted to its agricultural or productive qualities, but inquiry may be made as to all other legitimate purposes to which the property could be appropriated." In delivering the opinion of the court Judge Lumpkin said: "When land or any other property is taken for public use, the owner is entitled to compensation for its whole value; not for this or that particular object, but for all purposes to which it may be appropriated. Suppose I have on my premises a waterfall, admirably adapted to machinery, and a portion of my land is seized and applied to the erection of a bridge or the construction of a railroad, so as to render the water-power unavailable; in computing my damages, ought not this fact to be taken into consideration? The value of land, or anything else, is its price in the market. Concede, then, that the right to erect this bridge is not in the Harrisons, but has been bestowed by the State upon this company, ought not the owners of the land to be paid for the worth of the site to the company? Who, in making investments of capital in real estate, is not influenced by the consideration that it will be valuable for a town, bridge, ferry, mill, manufacture, etc.?" In *Mitchell County* v. *Hudspeth*, 151 *Ga.* 767 (2), this court held: "Where one has land abutting on both sides of a navigable river on which she maintains and operates a public toll ferry, and has other land adjacent thereto which is sought to be condemned by

the county authorities of two counties, each of which lies upon opposite sides of. the river, and the owner has filed an equitable petition against both the counties jointly, to enjoin them from proceeding to condemn her land under section 5206· et seq. of the Civil Code of 1910, and for the recovery of damages by reason of the taking of her land for the purposes of building roads thereon and building a public free bridge across such stream, and the approaches thereto, it is proper, in order to arrive at just and adequate compensation in determining the value of such adjacent land taken for the bridge and roads, that its prospective value as a bridge site and its present value as a ferry site, may be taken into the calculation." The two cases just cited are directly in point. They were concurred in by all the Justices of this court, and are controlling. To the same effect see the case of *Dougherty County* v. *Tift,* supra.

In the majority opinion in this case it is stated that there is no conflict between what is ruled in the three cases just cited, "properly construed," and the present case; but to this I can not agree. If they are not in conflict, why attack them so vigorously? The present case is right in the teeth of those decisions, which lay down the correct rule in cases like the present. The *Harrison* case has stood unreversed for over three-quarters of a century, and has been a guide for bench and bar since its rendition. It is nowhere insisted by plaintiffs that they have the exclusive right to a franchise to operate a ferry on their own land, or that similar franchises may not be granted to others by condemnation proceedings and license, but merely that the State can not condemn their land without paying just and adequate damages, and considering every element going to make up those damages. Civil Code (1910), §§ 688, 781, are as follows: "In estimating the value of land when taken for public uses, it is not restricted to its agricultural or productive qualities, but inquiry may be made as to all other legitimate purposes to which the property could be appropriated." "In determining the value of land taken for a bridge, its prospective value as a bridge site and its present value as a ferry, if one is in use, may be taken into the calculation." Our own code and decisions lay down the rule for estimating damages in cases like the present, and we do not have to resort to outside jurisdictions to find a rule for such purpose. The language of our code

and of the decisions of this court is clear and unequivocal in declaring what shall be considered as elements of damage in cases like the instant one; and to simplify the matter further the parties agreed that there was but one question in the case, viz., what is the amount of compensation or damages to be awarded? And all that is said as to the value of *franchises,* and *competition* of *franchises,* and whether a franchise can be granted at all, has nothing to do with the case. These cases, our own cases, have stood the test for nearly a century, and have never been overruled or reversed, and should not now by judicial construction be declared of no effect. Let *stare decisis* be the rule now and always.

RUSSELL, C. J., concurs in the dissent.